UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

RODMAN & RENSHAW, LLC,
JOHN BORER, EDWARD RUBIN, MICHAEL
VASINKEVICH and WESLEY K. CLARK,

                      Plaintiffs,

    - against -

MATTHEW N. MURRAY,

                      Defendant.

- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- -- X

Case No. 06 CV 8210 (WHP)

**COMPLAINT**

Plaintiffs Rodman & Renshaw, LLC, John Borer, Edward Rubin, Michael

Vasinkevich, and Wesley K. Clark, by their attorneys, Siller Wilk LLP, as their complaint

against defendant Matthew N. Murray, allege as follows:

### INTRODUCTION

1.    Defendant Matthew N. Murray ("Murray"), a former employee of plaintiff

Rodman & Renshaw, LLC ("Rodman"), where he served as a research analyst under an

employment agreement making him an employee at will, was discharged from Rodman as a

result of unprofessional conduct. In retaliation, Murray embarked on a vicious and malicious

campaign aimed at destroying plaintiffs' reputations and businesses.

2.    Murray's latest assault -- and the one at the center of this action -- involves his

dissemination of defamatory statements on websites he posted surreptitiously, misappropriating

the individual plaintiffs' names for his domain names so as to falsely portray the sites as being

endorsed by or originating with plaintiffs, and on which he improperly and unlawfully uses the

trademark and trade name of Rodman. Although Murray could have used a website bearing his

name, or a variation of it, he chose to purchase and construct websites in the names of plaintiffs and to attempt to conceal that it was he who purchased and constructed those websites.

3.    And Murray's covert and frankly bizarre actions did not cease with the publication of the websites:  In transmitting E-mails publicizing the existence of the websites to various persons, Murray apparently pretended to be "Michael King" (another Rodman employee, and one with whom Murray has taken particular issue), rather than honestly sending the E-mails without an alias, under his own name.

4.    Murray's tortious conduct constitutes infringement, dilution and misuse of Rodman's trademark and trade name, false designation and endorsement, and cybersquatting, all in violation of the Federal Lanham Act, 15 U.S.C. §§ 1125 and 1129, and New York General Business Law § 360-l.

5.    There is no question that Murray created these offensive websites in a manner designed to lure the public and especially the investment banking community (including, but not limited to, plaintiffs' colleagues, clients, and the investment community in which plaintiffs function) into visiting the websites, believing them to be authorized by or originating with plaintiffs and, once so ensnared, to read the false and defamatory material published by Murray on the websites.

6.    As we show below, Murray's purpose in committing these unlawful acts was and is (i) to coerce Rodman into paying Murray substantial sums to which he is not entitled as a ransom for the cessation of the harassment and for the retrieval of plaintiffs' domain names and (ii) to retaliate against Rodman, his former employer, and some of its key employees.  No matter Murray's ultimate goal, his immediate objective is to do anything possible -- even violate

Federal and State law -- in order to tarnish plaintiffs' reputations, destroy the good will they have established over the past several years at great effort and expense, and ruin their businesses.

7.     No monetary award can adequately compensate plaintiffs for the irreparable injury to their trademark and to their names caused by Murray's violation of Federal and State statutes. Accordingly, plaintiffs respectfully urge the Court to immediately enjoin Murray from continuing to maintain the offending websites pending the determination of this action.

PARTIES

8.     Rodman is a Delaware limited liability company having its principal place of business located at 1270 Avenue of the Americas, 16th Floor, New York, New York 10020. Rodman is a full-service investment bank with an emphasis on serving emerging growth companies in the life sciences sector.

9.     Plaintiff John Borer ("Borer") is a resident of the State of New Jersey. Borer is the Chief Executive Officer of Rodman and is a founder and senior manager of the firm. Borer is well known in the investment banking field as one having extensive experience in transactions involving public and private underwritten offerings of equity and debt for middle market companies, as well as in the areas of corporate restructurings and mergers and acquisitions.

10.     Plaintiff Edward Rubin ("Rubin") is a resident of the State of New Jersey. Rubin is the President of Rodman and is well known in the investment banking field for his role in connection with arranging financing for public companies.

11.     Plaintiff Michael Vasinkevich ("Vasinkevich") is a resident of the State of New York. Vasenkevich is a senior managing director of Rodman and has achieved recognition in the

investment banking field for his specialization in private placement financing of growth companies.

12.     Plaintiff Wesley K. Clark ("Clark") resides in Arkansas.  Clark, a former four-star General and NATO Supreme Allied Commander, is chairman of Rodman & Renshaw Holding, LLC, the parent holding company of Rodman.

13.     Defendant Matthew N. Murray ("Murray") resides at 144 Franklin Street, Apt #1, New York, New York 10013.  Murray was employed as a research analyst at Rodman for less than one year and was effectively dismissed from the company on March 2, 2006, for unprofessional conduct.  At Murray's request, Rodman agreed to provide him with post-termination "air cover" and to continue paying his salary at its discretion while he searched for other employment, but Rodman withdrew that coverage on March 14, 2006, as a result of Murray's irascible conduct and threats against the company which had a pronounced negative effect on the workplace.

## JURISDICTION and VENUE

14.     This Court has (i) original jurisdiction over the subject matter of the claims brought under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, pursuant to 15 U.S.C. § 1121(a), 28 U.S.C. §§ 1331 and 1338(a); (ii) pendent jurisdiction over the related State law claims pursuant to 28 U.S.C. § 1338(b), in that such claims are joined with substantial and related claims under the Trademark Laws of the United States, 15 U.S.C. §§ 1051, *et seq.*; and (iii) supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367(a), as the claims are so related to those claims for which original jurisdiction with this Court lies that they form part of the same case or controversy under Article III of the United States Constitution.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to plaintiffs' claims occurred in this district and it is the district in which defendant resides.

## FACTS UNDERLYING ALL CLAIMS FOR RELIEF

### RODMAN'S RECOGNITION IN THE INVESTMENT BANKING FIELD

16.     Although historically established in 1951, the present-day Rodman was founded in 1998 by a group of senior Rodman professionals in the investment banking, sales and trading, and research areas.  With the addition in the summer of 2002 of one of the leading private placement teams on Wall Street, Rodman began to achieve recognition in the corporate finance area with respect to small cap, growth companies.

17.     Today, Rodman is one of the leaders in the corporate finance/investment banking industry for emerging growth companies, primarily within the life sciences sector.  Rodman has a complimentary focus on the technology sector.  The firm functions in three areas: investment banking where, since 2003, Rodman has completed over 100 transactions for small cap clients, raising billions of dollars of growth capital; research, with one of the most substantial life sciences research commitments on Wall Street and research analysts that are consistently among the highest-ranked by Starmine and others; and sales and trading, with an international presence and experienced institutional sales force.

18.     Rodman has achieved recognition as a leading name in the billion dollar, small cap life sciences sector.  As set forth above, since 2003, Rodman has raised billions of dollars in aggregate equity and debt transactions for small cap issuers.  In addition, Rodman has been

ranked No. 1 in the 2003, 2005 and year-to-date 2006 league tables for private placement transactions and was ranked No. 2 in 2004.

19.     Rodman's success is attributable to the efforts of its experienced, talented and skillful management team, including plaintiffs Borer, Rubin, and Vasinkevich.  Each of these individuals has received recognition as a leader in the life sciences small cap corporate finance and investment banking field.  In fact, it is precisely because of the public recognition associated with plaintiffs' names in the life sciences corporate finance/investment banking sector that Murray misappropriated those names for the websites he surreptitiously created, as described below.

20.     On June 1, 2006, Rodman applied to the United States Patent and Trademark Office ("USPTO") for trademark registration covering the use of the inherently distinctive Rodman & Renshaw mark.  As a result of a computer malfunction, there are currently two identical applications pending with the USPTO with respect to the Rodman mark.  The serial number on the first application is 78898375; the serial number on the second application is 78898482.  A copy of the first application is attached to this complaint in the form of Exhibit A.

21.     Since the establishment of the firm in 1951, the Rodman & Renshaw mark has been used extensively in all Rodman publications, reports and advertisements.

22.     Since at least 2002, the Rodman & Renshaw name has been used by Rodman extensively in connection with its corporate finance/investment banking business.  The Rodman & Renshaw mark has become well known and associated with Rodman, which is a leader in the small cap corporate finance and investment banking field.

23.     Rodman's trade name appears prominently and daily on Rodman's website, "rodmanandrenshaw.com," as well as in Rodman's research reports and publications and other materials disseminated to the public and particularly to the investment and business segments of the public.   The general public routinely sees the Rodman trade name and trademark in newspapers and magazines.   Not one publication issues from Rodman to the public without the distinctive Rodman mark attached.

24.     By virtue of the goodwill and reputation for service with respect to small cap emerging growth companies associated with the name Rodman & Renshaw and the extensive and long-standing use of the Rodman & Renshaw mark by Rodman, the Rodman & Renshaw mark has developed exceptionally strong secondary meaning and significance in the minds of the public.   Rodman's services have achieved substantial name recognition, especially in the corporate finance /investment banking industry.   Again, as set forth above, Rodman has raised billions of dollars in aggregate debt and equity transactions and has been ranked No. 1 in the 2003, 2005 and year-to-date 2006 league tables for private placement transactions and was ranked No. 2 in 2004.

25.     That name recognition has been expanded through the publication and advertisement of Rodman's services over the Internet on the Rodman website, where Rodman's services are described to millions of individuals, corporations and organizations worldwide.

26.     Similar name recognition has been achieved by Borer, Rubin, and Vasinkevich, who are the principals of Rodman and are recognized as leaders in the corporate finance/investment banking field for small cap emerging growth companies, primarily in the life sciences sector.   The public has come to associate Messrs. Borer, Rubin and Vasinkevich with

Rodman, and the Rodman & Renshaw trademark and their expertise and capabilities in the corporate finance/investment banking field for small cap emerging growth companies are well-known in the industry.

27.     It is no accident, therefore, that Murray has misappropriated both the Rodman mark and the identities of Messrs. Borer, Rubin, and Vasinkevich in purchasing and establishing the offending websites, while at the same time attempting to conceal his own identity through the use of "Domain By Proxy" and by sending E-mails under the name of a person he is determined to harm (Michael King), rather than by doing so openly and honestly under his own name.

MURRAY'S TERMINATION FROM RODMAN

28.     As set forth above, Murray joined Rodman on March 16, 2005, as a research analyst. On March 2, 2006, Murray was dismissed from his position as research analyst and was barred beginning that date from the research space of the firm and his office was taken away from him. At his own request, Murray was provided "air cover" at Rodman's discretion while he searched for other employment, but his remaining ties with the firm were terminated on March 14, 2006.

29.     Prior to his formal termination on March 14, 2006, but subsequent to his dismissal from his duties as a research analyst, Murray embarked on a malicious campaign of harassment, defamation and attempted intimidation against Rodman, its management, and its employees all apparently aimed at tarnishing plaintiffs' reputations and interfering with and destroying their businesses.

30.     Among other things and upon information and belief, subsequent to his dismissal on March 2, 2006, the date on which Murray lost all of his duties and responsibilities at Rodman

as well as his physical office and the date on which he became barred from the research space at Rodman, Murray approached the offices of Senator Charles Grassley, the chairman of the Senate Finance Committee, and by providing false information to those offices (with which he has a personal relationship) concerning Rodman, instigated an inquiry by the offices of Senator Grassley, the details of which have been consistently leaked to the press ever since, all in an effort to damage Rodman. In addition, Murray has initiated or caused to be initiated media coverage of the inquiry, as well as of other regulatory inquiries, and has bombarded Rodman and its employees with phone calls aimed at creating fear, unease, and havoc in the workplace. Murray has also attempted to capitalize on the position of Clark as the chairman of the Rodman holding company, by threatening to use Clark as a lightening rod in order to embroil Rodman in a political war not related to Murray's employment or dispute with Rodman.

31.    In addition to those tortious acts, and perhaps most shockingly of all, Murray recently extended his malevolent conduct to the Internet, as we describe below. The effects of this activity can reach millions of individuals and organizations, thereby requiring immediate relief from this Court to prevent further irreparable injury, as explained below.

MURRAY'S COMPUTER PIRACY

32.    Internet users can access each other's computers, can communicate directly with each other by means of electronic mail ("E-mail"), or can access various types of data and information. Each Internet user has an address, consisting of one or more address components, which address is commonly referred to as a "domain" or "domain name."

33.     Domain names serve as an address for sending and receiving E-mail and for posting information or providing other services.  On the Internet, the domain name serves as the primary identifier of the source of information, products or services.

34.     Common practice for the formulation of Internet domain names for users is to establish the user's trade name as the prefix for its domain name before the designation ".com," which identifies a service as being commercial in nature.  Similarly, individuals use their names as the prefix of their domain names, to the extent they establish domain names, in order to identify the source of the information set forth on the website.

35.     For example, since January 12, 1999, Rodman has maintained a website address under the domain name "rodmanandrenshaw.com," where Rodman describes its services and organization to the public.  As set forth above, the Rodman trademark is prominently featured on the website.  On the "About Us" page of the website, the Rodman name always appears in green, along with a shaded background depicting the pillars of the New York Stock Exchange building.

36.     Domain names can easily be registered and established by payment of a fee to certain organizations responsible for the registration of the domain names.

37.     As is set forth below, Murray used the Internet and its access to the public for the purpose of vilifying plaintiffs, and tarnishing their reputations by means of false accusations -- all for the purpose of ruining plaintiffs' businesses and extorting money from them as a *quid pro quo* for ceasing his malicious conduct.

38.     Thus, upon information and belief, on September 7, 2006, Murray paid for the registration of the following domain names: "johnborer.com," "edwardrubin.com," and

"michaelvasinkevich.com."   Each of these domain names appropriates the names of the individual plaintiffs.   Murray apparently attempted to conceal that he is the person who purchased the domain names by purchasing them through "Domain By Proxy," rather than simply by purchasing them in his own name. The following day, Murray paid for the registration of "jayauslander.com," but this time, without concealing his identity.   Mr. Auslander is a member of the law firm representing Rodman in connection with the termination of Murray's employment.

39.     On or about September 13, 2006, Murray posted three websites (referred to below as the "Murray Websites"). Each of the Murray Websites uses the names of Rodman personnel (johnborer.com, edwardrubin.com, and michaelvasinkevich.com) and contains identical information suggesting unlawful conduct on the part of Rodman in connection with the events leading up to and following the termination of Murray's employment.   Each of the sites prominently features Rodman's trademark and trade name, even using the same green color that appears on Rodman's own website, and providing the same shaded background depicting the New York Stock Exchange building edifice. True copies of each of the Murray Websites are attached to this complaint in the form of Exhibits B, C, and D. A true copy of Rodman's "About Us" page of its own website is attached to this complaint in the form of Exhibit E.

40.     Although Murray could easily have purchased and registered his own domain name or similar website, he deliberately chose to appropriate plaintiffs' names for that purpose because of their established name recognition in the life sciences sector of corporate finance/investment banking, where Murray knew the website would get the most attention from that segment of the corporate finance/investment banking industry and would be most damaging to Rodman.   Murray sought to capitalize on plaintiffs' name recognition because Internet users

searching for Rodman or any of the other plaintiffs would immediately come across the Murray Websites using the names purchased by Murray for that purpose.

41.     As set forth above, in addition to posting the Murray Websites using plaintiffs' names and Rodman's trademark, on or about September 13, 2006, Murray posted similar defamatory information on the "jayauslander.com" website.   This website, like the others formulated by Murray, prominently features the Rodman trademark and trade name, in green, with the New York Stock Exchange building edifice in shaded background.  The website also features Rodman's logo.  A true copy of the jauslander.com website is attached to this complaint in the form of Exhibit F.  Murray caused that website to be taken down on or about September 13, 2006, and it remains down as of this writing.

MURRAY MASQUERADES AS
RODMAN'S DIRECTOR OF RESEARCH

42.     Murray's bad faith in appropriating plaintiffs' names for the Murray Websites is readily apparent from the manner in which Murray brought those websites to plaintiffs' attention.

43.     On September 13, 2006, at 11:48 a.m., Murray sent or caused to be sent an E-mail to Borer, with a copy to Vasinkevich and Rubin, using the following sender's E-mail address: "michael king [nationalwhistleblowers@yahoo.com]."   The "subject" of the E-mail states: "Please visit www.johnborer.com."  A copy of this E-mail is attached to this complaint in the form of Exhibit G.

44.     On September 13, 2006, at 11:49 a.m., Murray sent or caused to be sent an E-mail to Rubin, with a copy to Vasinkevich and Borer, using the following sender's E-mail address: "michael king [nationalwhistleblowers@yahoo.com]."   The "subject" of the E-mail states:

"Please visit www.edwardrubin.com."  A copy of this E-mail is attached to this complaint in the form of Exhibit H.

45.   Michael King is Rodman's Director of Research.  By these E-mails, Murray masquerades as King in order to draw plaintiffs' immediate attention to the websites, rather than send the E-mail in an honest way, using his own, real name.  Murray's choice of King as the proposed sender of the above E-mails truly demonstrates Murray's malice, because the Murray Websites claim (falsely) that King had acted improperly in denying Murray's "request to lower his research rating on an investment banking client."  Moreover, in conversations with Rodman representatives following the termination of his employment, Murray demanded -- in addition to a substantial settlement -- that King, Murray's former supervisor, be publicly reprimanded and punished.

46.   The information posted on the Murray Websites was and is false and defamatory, maligning the character, reputation and integrity of plaintiffs by stating falsely that King, as Rodman's Director of Research, had "acted improperly in denying a senior analyst [*i.e.*, Murray] his request to lower his research rating on an investment banking client."  In fact, King had not acted improperly and the "client," Halozyme ("HTI"), although it had been an investment banking client for a transaction in December 2005 with respect to which Rodman was not even the lead placement agent, was not an active investment banking client of the firm.  The Murray Websites contain the additional false statement that "partners of Rodman [meaning Borer, Rubin and Vasinkevich] have maintained that broker-dealers control the ratings on stocks (not the analyst) and that they may fire an employee for any reason."

47.     Murray shut down the Murray Websites later on the same day that he had posted them, September 13, 2006. Late in the afternoon on September 13, at 5:12 p.m., using the same Michael King [nationalwhistleblowers@yahoo.com] sender's E-mail address, Murray sent or caused to be sent an E-mail to plaintiffs Rubin, Vasinkevich, and Borer threatening "to put the sites back on the web and conduct a survey of Wall Street professionals on whether [their] actions constitute acceptable conduct or unethical behavior," unless plaintiffs responded "with suggested changes to the websites…within one week." The E-mail is signed "Webmaster." A copy of this E-mail is attached to this complaint in the Form of Exhibit I.

48.     The clear message intended to be conveyed to the public by Murray through the Murray Websites, their texts and their "links" is that plaintiffs committed securities law/regulation violations and acted unlawfully in connection with Murray's termination. These statements and their messages are false and Murray knows them to be false. But instead of using lawful means to obtain redress (although in fact he is not entitled to redress), Murray resorted to violating Federal and State law in  his vicious attempt to vilify plaintiffs and to extort a "settlement" from them.

MURRAY'S ATTEMPT AT EXTORTION

49.     Those threats are consistent with the pattern of offensive conduct Murray has exhibited since his termination from Rodman: defaming plaintiffs and interfering with plaintiffs' businesses through multiple harassing phone calls and press leaks -- everything but resort to the courts, which would have been the proper, measured way to seek redress -- all in an attempt to exact ransom money as a condition for Murray ceasing his malicious and offensive conduct. For example, in conversations with Rodman personnel following his discharge, Murray indicated that the disparagement of Rodman would continue and would increase unless Rodman negotiated

a settlement with him.  This attempt at commercial blackmail is behind Murray's demands for "suggested changes" to the Murray Websites.

50.     On September 19, 2006, Murray re-posted the Murray Websites when plaintiffs refused to capitulate to Murray's attempted extortion, with the exception of the jayauslander.com website.  Murray also posted a new, equally infringing and defamatory website featuring the Rodman trademark and trade name precisely the way it appears on all Rodman publications and on Rodman's own website, with the same shaded background depicting the pillars of the New York Stock Exchange building, but this time including photographs of Clark, the chairman of the company that holds Rodman.  The name of that website is "generalclarkandrodman.com."  A copy of the website is attached to this complaint in the form of Exhibit J.

51.     In addition to the same defamatory statements appearing on the Murray Websites, generalclarkandrodman.com contains false and defamatory statements accusing Clark of breaching his fiduciary duties as chairman of the holding company.  The defamatory statements tarnish Clark's reputation, both with respect to his distinguished career in public service as well as in the business world, where he has achieved recognition for his abilities and integrity.

52.     As of the date of this complaint, the Murray Websites (with the exception of jayauslander.com) are still posted on the Internet.  Murray has not terminated his registration of the domain names used for the Murray Websites.

53.     Murray was never authorized to use the Rodman trademark and trade name, nor the names of the individual plaintiffs.  Murray was fully aware of Rodman's trademark and trade name and he attempted to capitalize on that name recognition and on the name recognition of the individuals' names in their industry.  Indeed, the Rodman trademark and trade name are

featured prominently on the front of all research reports authored by Murray when he was employed as a research analyst at Rodman.

54.     Murray registered the domain names of the Murray Websites for the purposes of tarnishing plaintiffs' reputations, ruining their business, and extorting sums of money from them to which he is not entitled.  Indeed, as set forth above, Murray has repeatedly indicated that he would cease his offensive conduct towards Rodman and its principals if he were given a substantial settlement.

55.     In fact, Murray has more recently posted an additional website to disseminate his malicious and hateful message to the public.  On information and belief, on or about October 4, 2006, masquerading behind the domain name www.researchindependence.org, Murray disseminated further defamatory material in a mass E-mail directed to Rodman's clients and potential clients.  The nature of the "blast" and identity of the recipients indicate that Murray misappropriated Rodman's proprietary client list for the purpose of splattering them with his diatribe concerning Rodman, in a calculated effort to further tarnish plaintiffs' reputations and injure their businesses irreparably (not surprisingly, Murray failed to return a personal computer belonging to Rodman after his termination from the company, claiming that it had been lost and offering to pay for its replacement).  Upon information and belief, on October 5, 2006, Murray, again masquerading behind the domain name www.researchindependence.org, published another mass E-mail directed to Rodman's clients and potential clients, through which he disseminated a New York Times article of that day that contained false information about Rodman and Clark provided by Murray.  It is readily apparent that until ordered to cease and desist his contemptible conduct, Murray can be expected to continue his outrageous and highly damaging behavior.

56.    Murray has used the Rodman trademark and trade name wrongfully, willfully and maliciously and in order to interfere with plaintiffs' businesses to their economic detriment, by misrepresenting the source of the Murray Websites as plaintiffs, by diluting the distinctive nature of the Rodman & Renshaw trademark and trade name, and by using the Murray Websites for the purpose of coercing plaintiffs to pay Murray a hefty ransom.

## FIRST CLAIM FOR RELIEF
### Federal Trademark Dilution, 15 U.S.C. § 1125(c)

57.    Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 56, above.

58.    As a result of the duration and extensive use and publicity of the Rodman & Renshaw mark by Rodman and the degree of recognition of the Rodman & Renshaw mark, the Rodman & Renshaw mark has achieved an extensive degree of distinctiveness and is a famous trademark.

59.    As a result of Murray's use of the Rodman & Renshaw mark on the Murray Websites and with the "generalclarkandrodman.com" domain name, Murray is diluting the distinctive quality of the Rodman & Renshaw mark.

60.    Murray's conduct, as described above, is causing Rodman irreparable injury.

61.    Rodman lacks an adequate remedy at law because no amount of money can adequately compensate for and remedy the loss of goodwill and distinctiveness enjoyed by Rodman with respect to its Rodman & Renshaw mark.

SECOND CLAIM FOR RELIEF
False Designation of Origin, 15 U.S.C. § 1125

62.     Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 56, and 58 thorugh 61 above.

63.     The use by Murray in commerce of the Rodman & Renshaw trademark and of the domain names using the names of the individual plaintiffs is intended to mislead the public about the origin of the websites as originating from Rodman and its principals.

64.     The false designation of origin by Murray misleads and confuses Internet users by suggesting that the Murray Websites originate from plaintiffs because users may be misdirected initially to the Murray Websites with the aid of search engines, as a consequence of the similarity of plaintiffs' names and the domain names.  The use in commerce by Murray of the domain names generalclarkandrodman.com, johnborer.com, edwardrubin.com, and michaelvasinkevich-.com has a tendency to deceive or confuse consumers into believing that some or all of the domain names originate with or are affiliated with plaintiffs, or are approved by plaintiffs, or are otherwise associated with plaintiffs.

65.     The use by Murray of plaintiffs' names and of the Rodman & Renshaw mark affects the ability of plaintiffs to offer their services in commerce and hinders Internet users from accessing the services and publications of Rodman and information on Rodman's own website.

66.     The continued posting of the Murray Websites is causing plaintiffs irreparable injury.

67.   Plaintiffs lack an adequate remedy at law because no amount of money can compensate for and remedy the injury caused by the confusion generated from the intentional false endorsement and false designation of origin of the Murray Websites by Murray.

### THIRD CLAIM FOR RELIEF
### Trademark Dilution Under N.Y. Gen. Bus. L. § 360-1

68.   Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 56, 58 through 61, and 63 through 67 above.

69.   The acts by Murray as described above are likely to injure plaintiffs' businesses, reputations and good will.

70.   The use by Murray of the Rodman & Renshaw trademark and of plaintiffs' names in connection with the Murray Websites is unauthorized and is likely to dilute the distinctive quality of the Rodman & Renshaw trademark in violation of Section 360-1 of the New York General Business Law and causes injury to plaintiffs.

71.   Such likelihood of injury and of dilution entitles plaintiff under N.Y. Gen. Bus. L. § 360-1 to an injunction enjoining Murray from any use of the Rodman & Renshaw trademark and of plaintiffs' names, or variations of the Rodman trademark.

72.   The conduct by Murray, as described above, is causing plaintiffs irreparable injury.

73.   Plaintiffs lack an adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
### Federal Trademark Infringement, 15 U.S.C. § 1125

74.     Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 56, 58 through 61, 63 through 67, and 69 through 73 above.

75.     The use in commerce by Murray of the Rodman & Renshaw trademark is likely to cause confusion and mistake and to deceive the public as to the source or origin of the Murray Websites and the information provided by him through the Murray Websites.  The Rodman & Renshaw trademark and trade name have acquired secondary meaning in the minds of the investment public.

76.     The use by Murray of the Rodman & Renshaw trademark, as described above, constitutes trademark infringement in violation of 15 U.S.C. § 1125.

77.     The acts by Murray in infringing the Rodman trademark have caused and are causing irreparable injury to Rodman and to its trademark and to the business and goodwill represented by Rodman and the trademark.

78.     Unless enjoined by the Court, the infringement by Murray of Rodman's trademark will cause further irreparable injury, for which Rodman has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF
### Cybersquatting Pursuant To 15 U.S.C. § 1125(d)

79.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 56, 58 through 61, 63 through 67, 69 through 73, and 75 through 78 above.

80.   Rodman's name is a distinctive and famous mark and was a distinctive and famous mark at the time Murray registered the domain names for the Murray Websites and for generalclarkandrodman.com, and at all other times relevant here, pursuant to the Anticybersquatting Consumer Protection Act of 1999, 15 U.S.C. § 1125(d).

81.   Murray had, and continues to have, a bad faith intent to profit from the Rodman name, which is protected as a distinctive mark and personal name under 15 U.S.C. § 1125 (d)(1).

82.   Murray's use of the generalclarkandrodman.com domain name is confusingly similar to the Rodman & Renshaw trademark, by using the Rodman name in conjunction with the name of the chairman of its holding company, and was registered without the prior knowledge, permission, or consent of Rodman or Clark.

83.   Murray's motivation in using the confusingly similar domain name is to extort, among other things, a settlement payment from plaintiffs in exchange for Murray shutting down the Murray Websites and the generalclarkandrodman.com website, and assigning the rights of the domain names to plaintiffs. Such conduct violates 15 U.S.C. § 1125(d)(1).

84.   Rodman is therefore entitled to a judgment compelling Murray to transfer all ownership in the generalclarkandrodman.com domain name to Rodman or, in the alternative, for cancellation of the domain name pursuant to 15 U.S.C. § 1125(d)(1)(C).

85.   Rodman is further entitled to a preliminary and permanent injunction enjoining Murray from any use of the generalclarkandrodman.com domain name, or any domain name confusingly similar to Rodman & Renshaw, pursuant to 15 U.S.C. § 1116 (a).

86.     In addition, Rodman is entitled to a judgment awarding Rodman all actual damages proximately caused by Murray or, in the alternative, statutory damages of not less than $1,000 and not more than $100,000 for each wrongful act, as the Court considers just, pursuant to 15 U.S.C. § 1117(a), (d).

SIXTH CLAIM FOR RELIEF
Cyberpiracy Protection for Individuals Pursuant to 15 U.S.C. § 1129

87.     Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 56, 58 through 61, 63 through 67, 69 through 73, 75 through 78, and 80 through 86 above.

88.     Murray registered domain names that consist of the names of plaintiffs Borer, Rubin, Vasinkevich and Clark, without their consent and with the specific intent to profit from the use of their names by extorting a settlement payment from plaintiffs in exchange for the transfer to plaintiffs of their domain names.  Such conduct is in violation of 15 U.S.C. § 1129.

89.     Pursuant to 15 U.S.C. § 1129, Borer, Rubin, Vasinkevich and Clark are entitled to preliminary and permanent injunctive relief barring Murray from using Borer's, Rubin's, Vasinkevich's or Clark's names, or any name confusingly similar to any of them as domain names.

90.     In addition, pursuant to 15 U.S.C. § 1129, Borer, Rubin, Vasinkevich, and Clark are entitled to a judgment from this Court compelling Murray to transfer all ownership in their domain names to them or, in the alternative, for cancellation of the domain names.

WHEREFORE, plaintiffs request judgment:

A.      Preliminarily and permanently enjoining and restraining Murray, his agents, affiliates, servants, representatives, successors and assigns, and others in active concert or participation with him:

(i)      from using the Rodman & Renshaw trademark and trade name, and any variations of the Rodman & Renshaw trademark and trade name, or any other mark confusingly similar to such trademark and trade name, on the Internet or in any other medium;

(ii)     from creating or maintaining any of the Murray Websites or the generalclarkandrodman.com website on the Internet;

(iii)    from using any plaintiff's name in any manner likely to cause confusion by the public including, without limitation, the following domain names: generalclarkandrodman.com, johnborer.com, edwardrubin.com, and michaelvasinkevich.com; and

(iv)     from using any plaintiff's name in any manner likely to induce the belief that any of the Murray Websites is endorsed by any plaintiff;

B.      Ordering Murray to file with the Court and serve on plaintiffs within 30 days of the preliminary injunction, a report in writing under oath setting forth in detail the manner and form in which Murray has complied with the injunction;

C.   Ordering Murray to immediately transfer to plaintiffs the domain names listed above, or canceling those domain names;

D.   Awarding plaintiffs damages equal to three times the amount of damages sustained by plaintiffs, in an amount to be proven at trial but not less than $10,000,000;

E.   Awarding Rodman statutory damages of no less than $1,000 and no more than $100,000 per wrongful act on the Fifth Claim for Relief;

F.   Awarding plaintiffs punitive damages in an amount to be determined at trial, but at least $10,000,000;

G.   Awarding plaintiffs their costs and expenses, and reasonable attorneys' fees; and

H.   Granting plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
      October 6, 2006

                              SILLER WILK, LLP
                              *Attorneys for Plaintiffs*

                              By:_____
                                 Jay S. Auslander (JA 5866)
                                 675 Third Avenue
                                 New York, NY 10017
                                 (212) 981-2338