UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RODMAN & RENSHAW, LLC, JOHN BORER, EDWARD RUBIN, MICHAEL VASINKEVICH and WESLEY K. CLARK, | |
| Plaintiffs, | |
| - against - | |
| MATTHEW N. MURRAY, | |
| Defendant. | |

Case No. 06 CV 8210 (WHP)

**AMENDED ANSWER AND COUNTERCLAIMS**

Defendant, Matthew N. Murray, Ph.D./C.F.A., by his attorneys, Schlam Stone & Dolan LLP., as for his Answer to the Complaint, alleges as follows:

## INTRODUCTION

1.     Dr. Murray admits that he is a former employee of plaintiff Rodman & Renshaw, LLC ("Rodman"), admits that he served as a research analyst at Rodman under an employment agreement, and admits that he was discharged from Rodman.  To the extent that Paragraph 1 of the Complaint alleges that Dr. Murray was an employee at will, he admits that this allegation asserts a legal conclusion for which no answer is required.  Dr. Murray denies the remaining allegations in Paragraph 1 of the Complaint.

2.     Dr. Murray denies the allegations in Paragraph 2 of the Complaint, except he admits that they assert legal conclusions for which no answer is required.

3.     Dr. Murray denies the allegations in Paragraph 3 of the Complaint.

4.     Dr. Murray denies the allegations in Paragraph 4 of the Complaint, except he admits that they assert legal conclusions for which no answer is required.

5. Dr. Murray denies the allegations in Paragraph 5 of the Complaint, except he admits that they assert legal conclusions for which no answer is required.

6. Dr. Murray denies the allegations in Paragraph 6 of the Complaint, except he admits that they assert legal conclusions for which no answer is required.

7. Dr. Murray denies the allegations in Paragraph 7 of the Complaint, except he admits that they assert legal conclusions for which no answer is required.

## PARTIES

8. Dr. Murray admits that Rodman is a limited liability company having its principal place of business at 1270 Avenue of the Americas, 16th Floor, New York, NY 10020 and that Rodman is a NASD-registered broker dealer with an emphasis on serving emerging growth companies in the life sciences sector. Dr. Murray denies that Rodman is a full-service investment bank, given that the overwhelming majority of Rodman's revenue is generated from a controversial financial transaction called a private investment in publicly traded entity ("PIPE"). Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 8 of the Complaint.

9. Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9 of the Complaint.

10. Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 10 of the Complaint.

11. Dr. Murray admits that plaintiff Michael Vasinkevich is a senior managing director of Rodman. Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 11 of the Complaint.

12. Dr. Murray admits the allegations in Paragraph 12 of the Complaint.

13.     Dr. Murray admits that he resides at 144 Franklin Street, Apt. #1, New York, NY 10013, and that he was employed as a research analyst at Rodman for less than one year before his employment was terminated.  Dr. Murray denies the remaining allegations in Paragraph 13 of the Complaint.

## JURISDICTION AND VENUE

14.     Dr. Murray denies the allegations in Paragraph 14 of the Complaint, except admits that they assert legal conclusions for which no answer is required.

15.     Dr. Murray denies the allegations in Paragraph 15 of the Complaint, except admits that they assert legal conclusions for which no answer is required.

## FACTS UNDERLYING ALL CLAIMS FOR RELIEF

16.     Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 of the Complaint.

17.     Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 of the Complaint.

18.     Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 of the Complaint.

19.     Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first two sentences of Paragraph 19 of the Complaint. Dr. Murray denies the allegations contained in the last sentence of Paragraph 19 of the Complaint, except he admits that these allegations assert legal conclusions for which no answer is required.

20.     Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 of the Complaint.

21.    Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 of the Complaint.

22.    Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 of the Complaint.

23.    Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 23 of the Complaint.

24.    Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24 of the Complaint, except he admits that these allegations assert legal conclusions for which no answer is required.

25.    Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25 of the Complaint.

26.    Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 of the Complaint.

27.    Dr. Murray denies the allegations contained in Paragraph 27 of the Complaint.

28.    Dr. Murray admits the allegations contained in the first two sentences of Paragraph 28 of the Complaint, and he admits that his employment was terminated on March 14, 2006. Dr. Murray denies the remaining allegations contained in Paragraph 28 of the Complaint.

29.    Dr. Murray denies the allegations contained in Paragraph 29 of the Complaint.

30.    Dr. Murray admits that he approached a family member who is an attorney on the staff of the U.S. Senate Finance Committee seeking advice about Dr. Murray's concerns that he was removed from Rodman's research department in retaliation for his refusal to back off from his decision to downgrade his research rating on an investment banking client of Rodman. Dr. Murray admits that Rodman's retaliation against him has been the subject of media attention and

investigations by the Senate Finance Committee, the Securities and Exchange Commission, and the New York Attorney General, and that all of these institutions found him to be a credible and his allegations of impropriety by Rodman to be worthy of further investigation. Dr. Murray denies the remaining allegations contained in Paragraph 30 of the Complaint.

31. Dr. Murray admits that he has published his views and relevant facts concerning his mistreatment by Rodman on the Internet. Dr. Murray denies the remaining allegations contained in Paragraph 31 of the Complaint.

32. Dr. Murray admits the allegations contained in Paragraph 32 of the Complaint.

33. Dr. Murray admits the allegations contained in the first sentence of Paragraph 33 of the Complaint and denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the remainder of Paragraph 33 of the Complaint.

34. Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34 of the Complaint.

35. Dr. Murray admits the allegations contained in the first sentence of Paragraph 35 of the Complaint, except he denies knowledge or information sufficient to form a belief as to the truth of exactly when Rodman began maintaining a website address under the domain name "rodmanandrenshaw.com." Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 35 of the Complaint.

36. Dr. Murray denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36 of the Complaint.

37. Dr. Murray denies the allegations contained in Paragraph 37 of the Complaint.

38. Dr. Murray admits the allegations contained in the first sentence of Paragraph 38 of the Complaint. Dr. Murray admits that, on September 7, 2006, he paid for the registration of

"jayauslander.com." Dr. Murray admits the allegations contained in the last sentence of Paragraph 38 of the Complaint. Dr. Murray denies the remaining allegations in Paragraph 38 of the Complaint.

39. Dr. Murray admits the allegations contained in Paragraph 39 of the Complaint, except he denies that each of the websites referenced therein prominently featured Rodman's trademark and trade name and that he personally "posted" the websites referenced therein.

40. Dr. Murray denies the allegations contained in Paragraph 40 of the Complaint.

41. Dr. Murray admits that, on or about September 13, 2006, he caused information similar to the information described in Paragraph 39 of the Complaint to be posted on the "jayauslander.com" website. Murray admits that he caused the "jayauslander.com" website to be taken down on or about September 13, 2006. Dr. Murray denies the remaining allegations contained in Paragraph 41 of the Complaint.

42. Dr. Murray denies the allegations contained in Paragraph 42 of the Complaint.

43. Dr. Murray admits the allegations contained in Paragraph 43 of the Complaint.

44. Dr. Murray admits the allegations contained in Paragraph 44 of the Complaint.

45. Dr. Murray admits the allegations contained in the first sentence of Paragraph 45 of the Complaint. Dr. Murray admits that, in conversations with Rodman representatives following the termination of his employment, he expressed his opinion that Mr. King be held accountable and publicly reprimanded for his role in improperly retaliating against Dr. Murray. Dr. Murray denies the remaining allegations contained in Paragraph 45 of the Complaint.

46. Dr. Murray admits that the statements quoted in Paragraph 46 of the Complaint are accurate quotations. Dr. Murray denies the remaining allegations contained in Paragraph 46 of the Complaint.

47. Dr. Murray admits the allegations contained in Paragraph 47 of the Complaint.

48. Dr. Murray denies the allegations contained in Paragraph 48 of the Complaint.

49. Dr. Murray denies the allegations contained in Paragraph 49 of the Complaint.

50. Dr. Murray admits that, on September 19, 2006, he caused the Murray Websites to be re-posted, with the exception of "jayauslander.com." Dr. Murray also admits that, on September 19, 2006, he caused the "generalclarkandrodman.com" website to be posted and it contained pictures of General Clark. Dr. Murray denies the remaining allegations contained in Paragraph 50 of the Complaint, except he admits that these allegations assert legal conclusions for which no answer is required.

51. Dr. Murray denies the allegations contained in Paragraph 51 of the Complaint.

52. Dr. Murray admits the allegations contained in Paragraph 52 of the Complaint.

53. Dr. Murray denies the allegations contained in Paragraph 53 of the Complaint, except he admits that these allegations assert legal conclusions for which no answer is required.

54. Dr. Murray denies the allegations contained in Paragraph 54 of the Complaint.

55. Dr. Murray admits that he caused the www.researchindependence.org website to be posted on or about October 4, 2006 and that he has caused e-mails to be disseminated to Rodman's clients and potential clients discussing his legitimate grievances against Rodman. Dr. Murray admits that, on October 5, 2006, he caused an e-mail to be published to members of the financial community and that this e-mail contained a hyperlink to an article published in the *New York Times* by Pulitzer-Prize winning journalist Gretchen Morgenson detailing the ongoing investigations of Rodman and General Clark arising out of Rodman's improper retaliation against Dr. Murray. Dr. Murray denies the remaining allegations contained in Paragraph 55 of the Complaint.

56.     Dr. Murray denies the allegations contained in Paragraph 56 of the Complaint.

## FIRST CLAIM FOR RELIEF
## Federal Trademark Dilution, 15 U.S.C. § 1125(c)

57.     Dr. Murray repeats, reiterates and realleges each and every response contained in Paragraphs enumerated 1 through 56 of the Answer as if more fully set forth at length herein.

58.     Dr. Murray denies the allegations contained in Paragraph 58 of the Complaint.

59.     Dr. Murray denies the allegations contained in Paragraph 59 of the Complaint.

60.     Dr. Murray denies the allegations contained in Paragraph 60 of the Complaint.

61.     Dr. Murray denies the allegations contained in Paragraph 61 of the Complaint.

## SECOND CLAIM FOR RELIEF
## False Designation of Origin, 15 U.S.C. § 1125

62.     Dr. Murray repeats, reiterates and realleges each and every response contained in Paragraphs enumerated 1 through 61 of the Answer as if more fully set forth at length herein.

63.     Dr. Murray denies the allegations contained in Paragraph 63 of the Complaint.

64.     Dr. Murray denies the allegations contained in Paragraph 64 of the Complaint.

65.     Dr. Murray denies the allegations contained in Paragraph 65 of the Complaint, except he admits that these allegations assert legal conclusions for which no answer is required.

66.     Dr. Murray denies the allegations contained in Paragraph 66 of the Complaint.

67.     Dr. Murray denies the allegations contained in Paragraph 67 of the Complaint.

## THIRD CLAIM FOR RELIEF
## Trademark Dilution Under N.Y. Gen. Bus. L. § 360-1

68.     Dr. Murray repeats, reiterates and realleges each and every response contained in Paragraphs enumerated 1 through 67 of the Answer as if more fully set forth at length herein.

69.     Dr. Murray denies the allegations contained in Paragraph 69 of the Complaint.

70.     Dr. Murray denies the allegations contained in Paragraph 70 of the Complaint.

71.    Dr. Murray denies the allegations contained in Paragraph 71 of the Complaint.

72.    Dr. Murray denies the allegations contained in Paragraph 72 of the Complaint.

73.    Dr. Murray denies the allegations contained in Paragraph 73 of the Complaint.

## FOURTH CLAIM FOR RELIEF
### Federal Trademark Infringement, 15 U.S.C. § 1125

74.    Dr. Murray repeats, reiterates and realleges each and every response contained in Paragraphs enumerated 1 through 73 of the Answer as if more fully set forth at length herein.

75.    Dr. Murray denies the allegations contained in Paragraph 75 of the Complaint.

76.    Dr. Murray denies the allegations contained in Paragraph 76 of the Complaint.

77.    Dr. Murray denies the allegations contained in Paragraph 77 of the Complaint.

78.    Dr. Murray denies the allegations contained in Paragraph 78 of the Complaint.

## FIFTH CLAIM FOR RELIEF
### Cybersquatting Pursuant To 15 U.S.C. § 1125(d)

79.    Dr. Murray repeats, reiterates and realleges each and every response contained in Paragraphs enumerated 1 through 78 of the Answer as if more fully set forth at length herein.

80.    Dr. Murray denies the allegations contained in Paragraph 80 of the Complaint.

81.    Dr. Murray denies the allegations contained in Paragraph 81 of the Complaint.

82.    Dr. Murray denies the allegations contained in Paragraph 82 of the Complaint.

83.    Dr. Murray denies the allegations contained in Paragraph 83 of the Complaint.

84.    Dr. Murray denies the allegations contained in Paragraph 84 of the Complaint.

85.    Dr. Murray denies the allegations contained in Paragraph 85 of the Complaint.

86.    Dr. Murray denies the allegations contained in Paragraph 86 of the Complaint.

## SIXTH CLAIM FOR RELIEF
## Cyberpiracy Protection for Individuals Pursuant to 15 U.S.C. § 1129

87.     Dr. Murray repeats, reiterates and realleges each and every response contained in

Paragraphs enumerated 1 through 86 of the Answer as if more fully set forth at length herein.

88.     Dr. Murray denies the allegations contained in Paragraph 88 of the Complaint.

89.     Dr. Murray denies the allegations contained in Paragraph 89 of the Complaint.

90.     Dr. Murray denies the allegations contained in Paragraph 90 of the Complaint.

### AS AND FOR DEFENDANT'S FIRST, SEPARATE
### AND DISTINCT AFFIRMATIVE DEFENSE

91.     The Complaint fails to state causes of action upon which relief can be granted.

### AS AND FOR DEFENDANT'S SECOND, SEPARATE
### AND DISTINCT AFFIRMATIVE DEFENSE

92.     Plaintiffs are barred from the relief requested in the Complaint pursuant to the

doctrine of "unclean hands," as codified at 15 U.S.C. § 1115(b)(7), and otherwise.

### AS AND FOR DEFENDANT'S THIRD, SEPARATE
### AND DISTINCT AFFIRMATIVE DEFENSE

93.     Plaintiffs are barred from recovery by the doctrine of laches.

### AS AND FOR DEFENDANT'S FOURTH, SEPARATE
### AND DISTINCT AFFIRMATIVE DEFENSE

94.     Plaintiffs are barred from recovery by the doctrine of setoff.

### AS AND FOR DEFENDANT'S FIFTH, SEPARATE
### AND DISTINCT AFFIRMATIVE DEFENSE

95.     Plaintiffs are barred from recovery by the doctrines of waiver and estoppel.

### AS AND FOR DEFENDANT'S SIXTH, SEPARATE
### AND DISTINCT AFFIRMATIVE DEFENSE

96.     Defendant was privileged in taking the actions alleged.

**WHEREFORE,** defendant Matthew N. Murray demands judgment in his favor, dismissing each of the causes of action with prejudice; awarding him the attorneys' fees and costs in defending this action; and for such other and further relief as to the Court deems fair and just.

## DEFENDANT'S AMENDED COUNTERCLAIMS

Defendant Matthew N. Murray, Ph.D./C.F.A., through his undersigned counsel, for his counterclaim against Plaintiffs Rodman & Renshaw, LLC ("Rodman"), John Borer, Edward Rubin, Michael Vasinkevich, and Wesley K. Clark, alleges as follows:

## NATURE OF ACTION

1.     Dr. Murray asserts these counterclaims against Rodman, his former employer; Rodman's three principal members – Mr. Borer, Mr. Rubin, and Mr. Vasinkevich -- and General Clark, Rodman's Chairman.  Dr. Murray's claims arose in the post-Enron/WorldCom regulatory environment where the independence of Wall Street's research analysts was supposed to be protected against retaliation from their employers for issuing negative opinions about investment banking clients.  Congress passed the Sarbanes-Oxley Act to protect whistle blowers who reported their employers' misconduct to, among others, Members of Congress.  The SEC promulgated Regulation AC, which requires Wall Street research analysts to attest to their beliefs in the accuracy of their research.  And the NASD promulgated NASD Rule 2711, which prohibits investment bankers from retaliating against their research analyst colleagues when the former do not like the work product produced by the latter.  Finally, Attorney General Spitzer's Global Settlement contained significant guaranties of research analyst independence in order to restore the investing public's confidence in Wall Street.

2.     Notwithstanding this regulatory environment intended to protect the independent judgment of research analysts, Dr. Murray – Rodman's top-ranked research analyst with a spotless U-5 – was removed from Rodman's research department less than a year after he arrived and within days of his refusal to back away from a downgrade of his rating on one of Rodman's investment banking clients and after he twice unsuccessfully requested to have his name removed from Rodman's research report covering this client.  To add insult to injury, Rodman subsequently terminated Dr. Murray's employment shortly after being told by Dr. Murray that he had informed an attorney on the staff of the U.S. Senate Finance Committee about Rodman's regulatory violations.  During the approximately six months that have elapsed since Dr. Murray was terminated, neither Rodman nor General Clark has ever articulated the specific, non-retaliatory reason he was terminated.  Finally, General Clark has abdicated his fiduciary responsibilities as Rodman's Chairman by repeatedly declining Dr. Murray's requests that General Clark meet with Dr. Murray and launch an independent investigation into Dr. Murray's allegations of wrongdoing at Rodman.  Instead, General Clark has circled the wagons with the other three individual Plaintiffs and sought to destroy Dr. Murray's reputation by placing defamatory statements on his NASD Form U-5 and making defamatory statements about him in the media.

3.     Although the Plaintiffs have failed to take Dr. Murray's concerns seriously, the SEC, the New York Attorney General, and the Senate Finance Committee all have found Dr. Murray's allegations to be credible. After conducting several lengthy interviews with Dr. Murray and reviewing several unambiguous e-mail exchanges between Rodman personnel and Dr. Murray (copies of which can be viewed at www.researchindependence.org), these governmental agencies have launched investigations into the way Dr. Murray was mistreated by Rodman.  A

fourth regulatory agency – the NASD – has decided to wait for the results of the SEC's investigation before beginning its own investigation.

4.      Finally, notwithstanding this intense regulatory scrutiny and the largely unfavorable press coverage its has received in publications as diverse as *The New York Times* and the *New York Post*, Rodman has escalated its smear campaign against Dr. Murray by suing him for trademark infringement and cybersquatting. Rodman's lawsuit against Dr. Murray was filed only days after it was the subject of a second critical article in *The New York Times* by Pulitzer Prize-winning journalist Gretchen Morgenson and after Dr. Murray was interviewed on CNBC by respected journalist Maria Bartonomo. The gravamen of Rodman's lawsuit involves certain websites that Dr. Murray caused to be posted and that sought to disseminate his grievances against Rodman on the Internet. Tellingly, Rodman knew of these websites for approximately one month before they sued Dr. Murray because he told Rodman about them and offered them an opportunity to correct any misstatements that Rodman believed were present. Indeed, prior to filing its lawsuit, Rodman never even wrote Dr. Murray or his attorney a letter requesting that these websites be taken down. It is obvious that Rodman's lawsuit was intended further to intimidate Dr. Murray and punish him for speaking with regulators and the media about Rodman's inappropriate retaliation against him and Rodman's unsuccessful attempt to compromise his independence as a research analyst.

5.      The day after Dr. Murray filed his Answer and counterclaims in this action, Rodman filed a statement of claim against him in the NASD (No. 06-04643) alleging claims based on the same facts and circumstances that are the subjects of the claims and counterclaims in this action. At the same time, Rodman sought to force Dr. Murray to arbitrate his

counterclaims in the NASD while at the same time forcing him to litigate the claims filed against him by Plaintiffs in this Court.

6.     Thus, Rodman has engaged in a pattern of retaliation against Dr. Murray, with the instant action being at least the fifth example of improper and illegal actions taken by Rodman following actions taken by Dr. Murray to expose Rodman's misdeeds:

(a) **Removal of Dr. Murray From the Research Department**

Tues., 2/28/06:  Dr. Murray asks to have his name removed from coverage of a Rodman investment banking client.
Thurs., 3/2/06: Dr. Murray is removed from Rodman's Research Department.

(b) **Termination of Dr. Murray's Employment**

Fri., 3/10/06: Dr. Murray informs Rodman that he reported Rodman's actions to Congress.
Tues., 3/14/06: Rodman terminated Dr. Murray's employment.

(c) **Defamatory Statements Place on Dr. Murray's U-5**

Sunday, 4/9/06:  *New York Times* publishes article that supports Dr. Murray
Wed., 4/12/06:  Rodman places defamatory statements on Dr. Murray's U-5

(d) **Integrity of Dr. Murray's Family Member Impugned**

Fri., 10/6/06  Dr. Murray appears on CNBC segment on Research Independence
Fri., 10/6/06:  General Clark reveals name of Dr. Murray's family member to CNBC and impugns this family member's reputation

(e) **Federal Lawsuit**

10/4-10/6/06:  *New York Times, New York Post, and CNBC report favorably on Dr. Murray*
10/10/06:        Rodman files lawsuit against Dr. Murray regarding websites Rodman had known about for weeks and had never asked to be taken down

(f) **NASD Arbitration**

10/17/06:  Dr. Murray files his Answer and counterclaims in this Court.
10/18/06:  Rodman files for arbitration with the NASD and asks this Court to force Dr. Murray to arbitrate his counterclaims while at the same time

defending against Plaintiffs' claims in this Court.

**PARTIES**

7.    On information and belief, Rodman is a Delaware limited liability company that maintains its principal place of business in New York, New York.

8.    On information and belief, Mr. Borer is a resident of the State of New Jersey and the Chief Executive Officer of Rodman.

9.    On information and belief, Mr. Rubin is a resident of the State of New Jersey and the President of Rodman.

10.    On information and belief, Mr. Vasinkevich is a resident of the State of New York and a Senior Managing Director at Rodman.

11.    On information and belief, General Clark is a resident of Arkansas, the Chairman of Rodman & Renshaw Holding, the parent holding company of Rodman, and a former candidate for the Democratic nomination for the presidency of the United States.

**BACKGROUND**

**A.    Dr. Murray Joins Rodman**

12.    Dr. Murray has had a long and successful Wall Street career.  He holds a Ph.D. in biophysics from the University of California at Berkeley, where he graduated first in his class, and he also holds a CFA degree.  He joined Rodman in March 2005.  At the time he was hired by Rodman, Dr. Murray's U-5 was completely "clean."

13.    In May 2005, shortly after Dr. Murray joined Rodman, the firm issued a press release (attached hereto as Exhibit 1) referring to him as one of "two prominent healthcare analysts" that it had added to its "life sciences research team."  The press release painted a glowing picture of Dr. Murray:

Matthew Murray, Ph.D., CFA, one of the few Wall Street analysts with extensive experience on both the money management and brokerage sides of the industry, [has] joined the research team at Rodman & Renshaw. Dr. Murray was most recently a portfolio manager and healthcare analyst at Alliance Capital, a position he held for the past six years. Prior to joining Alliance, he was a senior biotechnology analyst at Lehman Brothers and also served in similar capacities at Union Bank of Switzerland, and Alex Brown. Before starting a career on Wall Street, Dr. Murray worked at the National Academy of Sciences and as a staff member in the United States Senate. . . . At Rodman & Renshaw, Dr. Murray will cover a wide variety of life-sciences companies, ranging from micro-cap opportunities to the large-cap industry leaders.

John Borer, President of Rodman & Renshaw, stated, "We are very pleased with the addition of these two renowned analysts in the life-sciences sector to our already well-regarded team of analysts. The collective experience that Michael [King] and Matthew bring to the table will further enhance Rodman & Renshaw's preeminence in the life-sciences sectors."

14.     Dr. Murray was hired by Rodman in order to strengthen the firm's biotech research group. According to *First Call*, a professional publication that ranks research analysts by counting the number of research analyst's reports are "clicked" by clients, in the month prior to Dr. Murray's arrival, Rodman's biotech research ranked 17th among its peers, a metric that is monitored by Rodman to measure the success of its research department and one of the variables that is used by Rodman to compensate analysts. Dr. Murray was offered an opportunity by the partners at Rodman to "shake things up" in the equities group. Over the course of the next nine months, he recruited a new head of research (Michael King), sales, and healthcare investment banking.

15.     Nine months after Dr. Murray arrived, Rodman was ranked third by *First Call* in biotech research for the first time, and Dr. Murray was ranked as the top analyst at Rodman. The following month, Rodman was once again ranked third by *First Call* in biotech research, and Dr. Murray remained the top ranked biotech analyst at Rodman. In recognition of Dr. Murray's accomplishments, Rodman offered him an opportunity to purchase two percent of the company's

equity at book value. In addition, Rodman hired an associate analyst for Dr. Murray to replace one that had left. At this time, Dr. Murray's team had four members.

**B.    Dr. Murray Initiates Coverage of One of Rodman's Investment Banking Clients**

16.    In September 2005, Dr. Murray initiated research coverage on Halozyme (NASDAQ: HTI) with a "Market Outperform" rating and a target price of $2.88/share. The price of the stock at initiation of coverage was $1.86/share.

17.    On information and belief, in December 2005, Rodman received a banking fee for acting as a placement agent on a $17 million financing for Halozyme (shares were sold at $1.75/share).

18.    By the end of January 2006, Halozyme's stock price closed at $1.87/share.

19.    On February 13, 2006, Halozyme issued a press release announcing that it had received a notice of allowance for a patent. In response, Dr. Murray issued a research note on *First Call* in which he restated his $2.88/share target price. Halozyme's stock closed that day at $2.18/share.

**C.    Dr. Murray Attempts to Downgrade His Recommendation of Rodman's Investment Banking Client**

20.    On Friday, February 24, with Halozyme's stock price up 30% in one week and no apparent change in fundamentals or new press releases from the company, Dr. Murray spoke with Halozyme's CFO by phone and asked about any new information that might be responsible for the stock's price surge. In response, he was told that the only material event since the February 13 press release was a well received presentation by Halozyme at an investor conference. Because Halozyme's stock price (at the Friday close $2.80) was almost at his target price ($2.88), Dr. Murray contacted members of Rodman's Investment Review Committee ("IRC") to request a meeting about Halozyme. Rodman policy requires approval of the IRC,

also called an Investment Policy Committee ("IPC"), before one of its research analysts can downgrade of an investment rating on a stock.

21.    A member of the IRC (who was also the head of sales) contacted Dr. Murray and told him that he should hold off on the downgrade until he could meet with Halozyme's CFO in person the following Monday.  Rodman had previously organized a non-deal road show for Halozyme's management to meet with clients in New York on Monday, February 27 and the management was scheduled to stop by the firm.  After Dr. Murray informed the IRC of his intention to downgrade Halozyme, Mr. Vasinkevich (who was also the banker for Halozyme) spoke with Dr. Murray about Halozyme.  Dr. Murray felt uncomfortable with the timing of the conversation and told Mr. Vasinkevich that all he was legally able to say about Halozyme was that his target price was $2.88/share and that he could not comment on what he would do with his investment rating.

22.    On Saturday, February 25, Dr. Murray received an e-mail from Mr. King, the Director of Research (attached hereto as Exhibit 2).  The e-mail indicated that Mr. King knew about the phone call between Mr. Vasinkevich and Dr. Murray.  Mr. King appeared to Dr. Murray to be upset that Dr. Murray had not considered the matter about a Monday morning downgrade "settled" following Dr. Murray's conversation with Mr. Vasinkevich and explicitly suggested that Dr. Murray speak with him about "finessing" his price target on Halozyme. Specifically, the e-mail stated:

> Matt, I'm curious to know why you're dragging Halozyme and MV [i.e., Mr. Vasinkevich] into the discussion over price targets.  The issue is settled.  If you'd like some help regarding how to finesse the price target on HTI your conversation should be had with me.  What I find disturbing is you know this already.  I'm available all weekend on cell and on email.

23.     Dr. Murray replied by e-mail (attached hereto as Exhibit 3) to Mr. King as
follows:

> I did not drag MV into a discussion about price targets. I made a compliance appropriate
> warning to the banker for the company that the stock was approaching my target price.
> Also, I have no interest in "finessing" price targets. I do not think that a prospectively
> defined price target should be changed unless there is a change in the fundamentals of the
> company.

24.     On Monday, February 27, Dr. Murray met with Halozyme's CFO at Rodman's
offices to review again the company's fundamentals since two of the four IRC members had
demanded that he do so. This meeting merely confirmed for Dr. Murray that, despite the run-up
in Halozyme's stock price (which closed at $3.00 that day -- well above his $2.88 price target),
there had been no significant change in the company's fundamentals. Dr. Murray then submitted
a written downgrade report to the IRC (attached hereto as Exhibit 4), after which he was
informed by one of the IRC members that Mr. King was furious that he would not change his
target price rather than lower his investment rating. Later that evening, Mr. King stated in an e-
mail to Dr. Murray (attached hereto as Exhibit 5):

> Did you even read this [downgrade report] before you sent it to me? The language is
> abysmal. It reads as though an illiterate wrote it. There is no way this can go out even if
> we hold an IPC in the morning.

25.     On Tuesday, February 28, Dr. Murray consulted with a securities lawyer outside
of Rodman. SEC Regulation AC requires all analysts to include attestation statements at the end
of their research reports. Conversely, under Regulation AC, analysts can demand to be removed
from coverage of a company if they do not believe in the investment rating and/or price target on
the stock. The attorney advised him to send a letter to William A. Iommi, Rodman's head of
compliance, requesting that his name be disassociated from Halozyme coverage.

26.     Specifically, in an e-mail to Mr. Iommi (attached hereto as Exhibit 6), Dr. Murray

wrote:

> I would like you to immediately remove my name from coverage of Halozyme. I do not
> favor recommending purchase of the stock at the current price (which is significantly
> above my price target) and have been prohibited by the Director of Research from
> downgrading the stock (see copy of email immediately below). I am receiving requests
> from salesman (which I have not responded to) to speak with their clients about this stock
> which puts me in a situation where my opinion on the stock is not the same as the rating
> that still exists on the stock in the First Call system.

27.     A few minutes later, Dr. Murray received the following response e-mail from Mr.

Iommi (attached hereto as Exhibit 7): "You must get approval from the committee. Mike [King]

will be in around 11AM." After waiting for over three hours for the IRC to meet and aware that

Mr. King had stated in a previous e-mail that he would not let Dr. Murray's downgrade report go

out even if the IRC approved it, Dr. Murray sent the following e-mail to Mr. Iommi (attached

hereto as Exhibit 8):

> Halozyme is trading above $3/share when my target price is $2.88/share. I am one of
> only two analysts covering this name and the stock has traded over 400,000 shares today
> with some investors incorrectly thinking that I am recommending purchase. This
> problem is compounded by the fact that Rodman sales people have taken the
> management to meet investors today after I requested to have my rating on the stock
> lowered. It is after 2PM and there is still no IPC. If I am not allowed to control my
> rating then I must ask for a second time to have my name removed from a stock. I do not
> believe in the market outperform rating at this price.

## D.     Rodman Retaliates Against Dr. Murray By Removing Him From the Research Department

28.     On Thursday, March 2, Dr. Murray was approached by Mr. Borer, who asked him

to come to Mr. Borer's office. Mr. Borer told Dr. Murray that Dr. Murray "had gone too far this

time" and that Mr. Borer felt that it would be best if Dr. Murray looked for another job. Mr.

Borer told Dr. Murray that the firm would create a cover story so nobody would find out that he

had been fired. Mr. Borer also said that the firm would honor its previous commitment to Dr.

Murray to allow him to purchase two percent of the firm's equity at book value. Dr. Murray also spoke with Mr. Rubin, who suggested that Dr. Murray start an asset management business for Rodman while he gave Mr. Borer time to "cool off." Later that day, Mr. Iommi circulated the following global e-mail to Rodman's employees (attached hereto as Exhibit 9) under the subject heading "INTERNAL USE ONLY - NOT TO BE DISSEMINATED OUTSIDE OF THE FIRM!": "Matt Murray is leaving the Research Department. In his new role at Rodman, he will be exploring the creation of an asset management business for Rodman & Renshaw Holding."

29.     Dr. Murray was also contacted by Mr. Vasinkevich, who also assured Dr. Murray that he would receive his two percent equity stake in Rodman, "even if I [i.e., Mr. Vasinkevich] ha[d] to pay it out of my share." When Dr. Murray spoke with counsel about Rodman's two percent equity settlement offer, he was advised that he should report Rodman's regulatory infractions before accepting the offer so that he could not later be accused of accepting a bribe in exchange for his silence.

**E.      Dr. Murray Seeks Advice From the Senate Finance Committee**

30.     On Thursday, March 9, Dr. Murray traveled to Washington, D.C. to meet with a member of the Senate Finance Committee staff to seek advice. Earlier in his career, Dr. Murray had worked for Senator Charles Grassley, who is now Chairman of the Senate Finance Committee. Majority Finance Committee Staff asked him to report the matter to Minority Staff, citing the likelihood of serious violations of SEC regulations and also told him that the matter should be reported to the SEC. In response, Dr. Murray requested one more opportunity to ask Rodman to address this matter internally and drafted a letter to General Clark.

31.     On Friday, March 10, Dr. Murray asked Mr. Rubin for permission to present the matter to General Clark. Dr. Murray also told Mr. Rubin that he had submitted an application to

the National Guard and suggested that, if the firm continued to employ him while he served in the military, this would allow time for tempers to cool and regulatory violations to be addressed.

**F.      Rodman Terminates Dr. Murray's Employment in Retaliation for Him Going to the Senate Finance Committee**

32.      On Tuesday, March 14, Dr. Murray returned from taking the Army written exam at Fort Hamilton to find an email from Siller & Wilk, Rodman's outside counsel, informing him that his employment at Rodman had been terminated. The next day, Dr. Murray informed the Senate Finance Committee staff of his termination, and the staff referred the matter to the SEC, which immediately opened an investigation.

33.      On Thursday, March 23, Dr. Murray emailed a letter to General Clark alerting him to Rodman's regulatory violations and the illegal retaliation to which Dr. Murray was being subjected. General Clark never responded.

**G.      Rodman Places a Defamatory Statement on Dr. Murray's U-5**

34.      On Sunday, April 9, a front-page article was published in the business section of *The New York Times* by Pulitzer Prize winning journalist Gretchen Morgenson detailing the facts of Dr. Murray's case. (Attached hereto as Exhibit 10). (The next day, Halozyme's stock price dropped 8% to $3.00/share, the same price (to the penny) the stock closed at on Monday, February 27, the day Dr. Murray tried unsuccessfully to lower his investment rating on the stock to "market perform".)

35.      On Wednesday, April 12, Rodman placed a statement on Dr. Murray's U-5 (attached hereto as Exhibit 11) that, on February 28, 2006, Rodman had "commenced an internal review of [Dr. Murray] to determine whether he violated the rules and regulations relating to analyst conduct, including provisions of NASD 2711 restricting communication with a company that is a subject of an analyst's report." This statement was placed on Dr. Murray's U-5 only

three days after the damaging *New York Times* article was published and six weeks after the purported investigation by Rodman had commenced. Moreover, the statement was placed on Dr. Murray's U-5 notwithstanding a promise made to him by Mr. Iommi after Dr. Murray's termination that Dr. Murray's U-5 would remain clean. Tellingly, at no time has Dr. Murray ever been contacted by Rodman to be interviewed in connection with this purported investigation.

**H.     The Senate Finance Committee Investigation**

36.     On Wednesday, May 3, Dr. Murray traveled to Washington for his first meeting with the Senate Finance Committee staff as part of the staff's investigation into Rodman's misconduct. Five days later, the New York City Bomb Squad sealed off the street in front of Dr. Murray's apartment and used a bomb robot to investigate a suspicious device found across the street from Dr. Murray's apartment.

37.     On Monday May 25, the Chairman and Ranking Member of the Senate Finance Committee sent a letter to the Chairman of the SEC (with a copy to General Clark) (attached hereto as Exhibit 12) asking for an update on the status of the investigation of Rodman's actions against Dr. Murray. The letter stated, in relevant part:

> We write today regarding allegations that were recently presented to our staff and reported in *The New York Times* regarding certain activities at Rodman & Renshaw L.L.C. (Rodman & Renshaw). The *Times* article, together with information provided to our offices by the terminated analyst, raises serious questions about whether Rodman & Renshaw may have violated 17 C.F.R. § 242.501 (regarding assurance that research reports accurately reflect the views of the named analyst) and NASD Rule 2711 (prohibiting retaliation against research analysts). These allegations raise serious questions regarding the independence of the research analysts at Rodman & Renshaw. As the regulatory agency charged with ensuring the protection of investors and the integrity of markets, the Securities and Exchange Commission (SEC) should ensure that all brokerage firms, regardless of size, are operating within the confines of the law. Accordingly, we request that your office provide a briefing to our Committee staff as soon as possible regarding the allegations set forth in the attached article. Further, we

formally request that the SEC conduct a comprehensive and thorough examination into this matter and provide us with regular updates.

38. A second letter was sent from the Senate Finance Committee Chairman to Rodman's Chairman, General Clark (attached hereto as Exhibit 13), asking him to appear before the Finance Committee to answer questions regarding Rodman's actions against Dr. Murray. That letter read, in relevant part:

As a member of the United States Senate, and as Chairman of the Committee on Finance, it is my duty under the constitution to conduct oversight into the actions of government agencies and entities that are regulated by them. I write today regarding allegations that were recently presented to our staff and reported on in *The New York Times* regarding certain activities at Rodman & Renshaw L.L.C. (Rodman & Renshaw). More specifically, the article in *The New York Times* discussed events surrounding the termination of a research analyst's employment with Rodman & Renshaw after his decision to downgrade the stock of one of the firm's investment banking clients. The article further outlines that a series of emails exist where senior managers at Rodman & Renshaw sought to intervene in the decision to downgrade this stock, offering to help the analyst "finesse the price target." Taken on their face, these allegations paint a picture of a firm that was attempting to control the outcome a research analyst report to benefit an investment banking client's stock price.

As you are aware, on April 28, 2003, the Securities and Exchange Commission (SEC), along with the National Association of Securities Dealers (NASD), the New York Stock Exchange (NYSE) and the New York State Attorney General's Office entered into a $1.4 billion global settlement agreement (global settlement) with 10 major Wall Street brokerage firms. The global settlement was a result of an investigation of practices at the major firms and potential bias in reports issued by research analysts on a stock of a company that is also an investment banking client of the same firm. Resulting from specific instances of manipulation of research reports, the global settlement required the major firms to undertake significant structural reforms, enhance disclosure requirements, create standards for protecting independent research, and provide money for investor education. More importantly, the global settlement served as a symbolic measure to show that independent research by Wall Street firms should in fact be wholly independent of the investment banking and other financial interests of the firms providing the research. While not a party to the global settlement agreement, nevertheless, Rodman & Renshaw ought to adhere to the principles established in the global settlement.

The allegations reported in *The New York Times* regarding Rodman & Renshaw create the appearance that the firm's research may not be sufficiently independent and reliable. I understand that the research analyst contacted you directly, via email on March 23, 2006, to report that the firm was continuing to recommend the stock contrary to his recommendation and seeking your assistance in taking corrective action. His email, and

the timeline it contains, raises serious questions about whether your firm may have violated 17 C.F.R. § 242.501 (regarding assurance that research reports accurately reflect the views of the named analyst) and NASD Rule 2711 (prohibiting retaliation against research analysts.

Accordingly, I request that you make yourself available for an interview with Committee staff. Please be prepared to address the following questions:

1. Having received information regarding potential misconduct at Rodman & Renshaw, what steps have you taken as Chairman of the Board to investigate these allegations?
2. Specifically, have you contacted the analyst or other witnesses involved to gather more information? If not, why not?
3. Have you consulted or hired outside counsel to investigate the circumstances and provide objective advice to the Board about how to respond to the allegations? If not why not?

    39.      During the summer of 2006, General Clark appeared twice before the Senate Finance Committee staff to answer questions as part of its investigation of Rodman's actions against Dr. Murray. Upon information and belief, General Clark made misrepresentations about Dr. Murray and the reasons for his termination when speaking to the Senate staff.

**_I._**     **Rodman and Clark Continue to Defame Dr. Murray**

    40.      Because General Clark is a former (and perhaps future) presidential candidate and because of the unusually inculpatory e-mail trail discussed above, Mr. Murray's situation has been the subject of intense scrutiny by the media. Instead of cooperating with the several ongoing investigations, Plaintiffs have repeatedly made defamatory statements against Mr. Murray that have been published in the press. Specifically, they have stated that Mr. Murray was fired for sound business reasons and not in retaliation of his refusal to back down from his downgrade. They have yet to elaborate on what these sound business reasons were.

**AS AND FOR THE FIRST COUNTERCLAIM AGAINST RODMAN**
**(BREACH OF CONTRACT)**

    41.      Dr. Murray, repeats, reiterates and realleges each and every allegation set forth in paragraphs 1-40 as though fully set forth herein.

42.     As a matter of law, a material term of the employment agreement between Rodman and Dr. Murray was that he could not be fired for refusing to compromise his legally protected independence from Rodman's investment banking unit and for complaining to regulators about Rodman's retaliating against him for trying to safeguard his independence.

43.     Rodman breached Dr. Murray's employment agreement by removing him from the research department and terminating his employment in retaliation for his asserting his independence as a research analyst and then reporting Rodman's retaliation to the Senate Finance Committee.

44.     Each of Rodman's breaches is material and willful and has directly injured Dr. Murray in an amount to be determined at trial but that is at least $1 million.

## AS AND FOR THE SECOND COUNTERCLAIM AGAINST RODMAN
## (BREACH OF CONTRACT)

45.     Dr. Murray repeats, reiterates and realleges each and every allegation set forth in paragraphs 1-44, inclusive, of this counterclaim as though fully set forth herein.

46.     Dr. Murray and Rodman was each a party to an oral agreement pursuant to which Dr. Murray was given an option to purchase two (2%) percent of the equity in Rodman for book value. Dr. Murray fully performed his material obligations under this agreement. Rodman has reneged on that agreement.

47.     Rodman's actions as alleged herein constituted a material breach of its agreement with Dr. Murray.

48.     Rodman's actions as alleged herein constituted a breach of the implied covenant of good faith and fair dealing contained in its agreement with Dr. Murray by seeking in bad faith to prevent performance of the agreement and withholding its benefits from Dr. Murray.

49.     Rodman's contractual breaches are material and have directly and proximately

injured Dr. Murray in an amount to be determined at trial but that is at least $1 million.

50.     In all actions complained of herein, Rodman acted willfully, with spite, malice, or reckless disregard for the rights of Dr. Murray

## AS AND FOR THE THIRD COUNTERCLAIM AGAINST ALL PLAINTIFFS
### (DEFAMATION)

51.     Dr. Murray, repeats, reiterates and realleges each and every allegation set forth in paragraphs 1-50, inclusive, of this counterclaim as though fully set forth herein.

52.     Plaintiffs intentionally made materially false statements on Mr. Murray's U-5 and to members of the media concerning his job performance and compliance with NASD rules.

53.     As a direct and proximate result of Plaintiffs' defamatory statements, Mr. Murray's reputation has been adversely affected and he has sustained significant damages in an amount to be determined at trial but which is at least $1 million.

54.     Mr. Murray is entitled to compensatory and punitive damages in an amount to be determined at trial.

## AS AND FOR THE FOURTH COUNTERCLAIM AGAINST ALL PLAINTIFFS
### (DECLARATORY JUDGMENT)

55.     Dr. Murray, repeats, reiterates and realleges each and every allegation set forth in paragraphs 1-54, inclusive, of this counterclaim as though fully set forth herein.

56.     The gravamen of Plaintiffs' lawsuit against Dr. Murray is that: (a) he was knowingly lying when he published statements on the Internet to the effect that he was improperly fired in retaliation for attempting to exercise his independence as a research analyst by asking to have his name removed from a research report in which he know longer had a good faith belief; (b) he was knowingly lying when he accused Rodman of placing a defamatory statement on his U-5, *viz.* that Rodman was conducting a legitimate investigation into whether he violated NASD rules; (c) he was knowingly lying when he refuted Plaintiffs' statements that he

had been fired for sound business reasons; (d) he was knowingly lying when he claimed that Rodman's firing of him and removing him from the research department violated NASD Rule 2711; (e) he was knowingly lying when he claimed that Rodman violated SEC Regulation AC when it refused to remove his name from a research report after he stated that he no longer believed that the contents of the report were true; and (f) he was knowingly lying when he stated that General Clark breached his fiduciary duties as Rodman's Chairman by refusing to demand an independent investigation into Mr. Murray's allegations of improper retaliation against him.

57.     These are ripe disputes among the parties, and the parties require the Court to determine their rights and obligations.

58.     Accordingly, Dr. Murray respectfully demands a declaratory judgment holding, *inter alia*, that (a) all Plaintiffs (except General Clark) improperly retaliated against him for attempting to exercise his independence as a research analyst by removing him from the research department and then terminating his employment; (b) all Plaintiffs (except General Clark) defamed him by causing a defamatory statement to be published on his U-5; (c) all Plaintiffs defamed him by publishing statements that he had been fired for sound business reasons; (d) Rodman violated NASD Rule 2711 by firing him and removing him from the research department in retaliation for attempting to exercise his independence as a research analyst; (e) Rodman violated SEC Regulation AC when it refused to remove his name from a research report after he stated that he no longer believed that the contents of the report were true; (f) General Clark breached his fiduciary duties as Rodman's Chairman by refusing to conduct an independent investigation into Mr. Murray's allegations of improper retaliation against him and by covering up the misconduct that has occurred; and (g) by filing this action and obtaining

preliminary injunction against Dr. Murray, Rodman has waived both its right to arbitrate the claims it filed in the NASD arbitration and Dr. Murray's counterclaims in this action.

**WHEREFORE,** defendant Matthew N. Murray demands judgment in his favor and against Plaintiffs on each of the counterclaims, a declaratory judgment, a preliminary and permanent injunction enjoining and restraining Rodman from proceeding with the claims in its NASD arbitration, and granting such other and further relief to Dr. Murray as the Court deems proper, together with the costs and disbursements in this action, including attorneys' fees and interest.

Dated: New York, New York
      November 14, 2006

Respectfully submitted,
**SCHLAM STONE & DOLAN LLP**

By: _____

Jeffrey M. Eilender (JME 8250)
David J. Katz (DJK 4729)
26 Broadway
New York, New York 10004
(212) 344-5400

*Attorneys for Defendant*
*Matthew N. Murray*


Exhibit 1

# Rodman & Renshaw Adds Two Prominent Analysts to Its Life-Sciences Research Team

NEW YORK--(BUSINESS WIRE)--May 3, 2005--Rodman & Renshaw, LLC today announces the appointment of two prominent healthcare analysts to its life-sciences research team.

Michael G. King, Jr., who is recognized among his peers as one of the sell-side's most authoritative voices on the life-sciences industry, joins Rodman & Renshaw after nearly three years as a managing director and senior biotechnology analyst at Banc of America Securities LLC (BofA). During his tenure at BofA, Mr. King was ranked #11 in the 2004 Institutional Investor All-Star Poll, and also ranked as runner-up in the hedge fund portion of the survey. Prior to BofA, Mr. King served as a managing director and senior biotechnology analyst at Robertson Stephens. He served in a similar capacity for three years at Vector Securities International. Mr. King has also been affiliated with Kidder, Peabody, Hambrecht and Quist, Alex Brown & Sons, and D. Blech and Co. At Rodman & Renshaw, Mr. King will cover a wide variety of life-sciences companies, ranging from micro-cap opportunities to the large-cap industry leaders.

Matthew Murray, Ph.D., CFA, one of the few Wall Street analysts with extensive experience on both the money management and brokerage sides of the industry, also joined the research team at Rodman & Renshaw. Dr. Murray was most recently a portfolio manager and healthcare analyst at Alliance Capital, a position he held for the past six years. Prior to joining Alliance, he was a senior biotechnology analyst at Lehman Brothers and also served in similar capacities at Union Bank of Switzerland, and Alex Brown. Before starting a career on Wall Street, Dr. Murray worked at the National Academy of Sciences and as a staff member in the United States Senate. He graduated first in his class from UC Berkeley to receive his Ph.D. in BioPhysics and has also earned a CFA degree. At Rodman & Renshaw, Dr. Murray will cover a wide variety of life-sciences companies, ranging from micro-cap opportunities to the large-cap industry leaders.

John Borer, President of Rodman & Renshaw, stated, "We are very pleased with the addition of these two renowned analysts in the life-sciences sector to our already well-regarded team of analysts. The collective experience that Michael and Matthew bring to the table will further enhance Rodman & Renshaw's preeminence in the life-sciences sectors."

About Rodman & Renshaw, LLC

Rodman & Renshaw is a privately-held, full-service investment bank committed to fostering the long-term success of emerging growth companies through capital raising, strategic advice, insightful research, and the development of institutional support. During the last two years, Rodman & Renshaw completed over 75 financing transactions, totaling over $1.2 billion. Rodman & Renshaw concentrates on emerging growth companies in the life science and technology sectors. More information is available at www.rodmanandrenshaw.com.

Contacts
Rodman & Renshaw, LLC
John J. Borer, III, 212-356-0500



Exhibit 2

Matt, I'm curious to know why you're dragging Halozyme and MV into the discussion over price targets. The issue is settled. If you'd like some help regarding how to finesse the price target on HTI your conversation should be had with me. What I find disturbing is you know this already. I'm available all weekend on cell and on email.

--Mike


Exhibit 3

From: Matthew Murray
Sent: Sunday, February 26, 2006 8:14 PM
To: Michael King Mobile
Subject: RE: Price targets

I did not drag MV into a discussion about price targets. I made a compliance appropriate warning to the banker for the company that the stock was approaching my target price. Also, I have no interest in "finessing" price targets. I do not think that a prospectively defined price target should be changed unless there is a change in the fundamentals of the company.

Matt


Exhibit 4



**Matthew Murray, PhD CFA**
212.356.0543
mmurray@rodmanandrenshaw.com

# HALOZYME (HTI)

BIOTECHNOLOGY

**Market Outperform / Speculative Risk**

Company Update

February 27, 2006

## Down-Grading to Market-Perform Based on Valuation Following Surge in Price

**MARKET DATA**

| | | |
|---|---|---|
| Halozyme | $3.00 | 27-Feb-06 |
| Target Price | | |
| Market | ASE | |
| 52 Wk High - Low | $ 2.85 - 1.50 | |
| Market Cap. ($M) | $150 | |
| Shares Out (M) | 50.0 | |
| Public Mkt Float (M) | 32 | |
| Avg. Daily Vol (000) | 78 | |

**BALANCE SHEET METRICS**

| | | |
|---|---|---|
| Cash ($M) | $21 | E |
| Long-Term Debt ($M) | $0 | E |
| Debt/Capital | 0.0% | |
| Cash/Share ($M) | $0.4 | |

**EARNINGS DATA**

| FY - 12/31 | 2004 A | 2005 E | 2006 E |
|---|---|---|---|
| 1Q - 3/31 | ($0.08) | ($0.06) A | ($0.06) |
| 2Q - 6/30 | ($0.05) | ($0.06) A | ($0.06) |
| 3Q - 9/30 | ($0.08) | ($0.07) A | ($0.05) |
| 4Q - 12/31 | ($0.05) | ($0.06) | ($0.04) |
| Full Year EPS* | ($0.26) | ($0.25) | ($0.21) |
| Revenue ($M) | $0.0 | $0.1 | $0.6 |
| EBITDA ($M) | ($9) | ($13) | ($13) |

**VALUATION METRICS**

| | | | |
|---|---|---|---|
| Price/Earnings | N/M | N/M | N/M |
| Price/Revenue | N/M | N/M | N/M |



*Source: Bigchrts.com*

### DOWNGRADE
We are downgrading Halozyme to Market Perform from Market Outperform because the stock has exceeded our prospectively defined target price of $2.88/share.

### SURGE IN STOCK PRICE
Halozyme's stock has recently surged from trading range of $1.75 - $2.00/share to $3.00/share. The only recent news that we are aware of the notice of allowance of a patent on HTI-101 from the US Patent Trademark Office (see note on 2-13-06). HTI-101 is a discovery stage program that is focused on the development of new clinical applications for a second patented enzyme. We chose not to change our numbers based upon this announcement have not noticed any other reason why the stock has appreciated ~40% in the last week.

### INVESTMENT THESIS
We believe that Halozyme represents a classic biotech business model. We believe that investors have now fully valued Halozyme's product pipeline, and therefore rate the stock Market Perform.

### RISKS
The main challenges facing the company include clinical trial risks and the ability to raise needed capital to finance further studies both with *Hylenex* and *Chemophase*.

### Upcoming Halozyme Events

| Event Date | Product | Event |
|---|---|---|
| 1H06 | Chemophase | Initiation of Chemophase Phase I/IIa trial |
| 1H06 | Hylenex | Launch of *Hylenex* |
| 2H06 | Enhanze | Initiate Enhanze clinical studies |

*For definitions, the distribution of analyst ratings, and other disclosures, please refer to pages 7-8 of this report.*

## Biotech Comparable Analysis

Last updated: 02/24/2006

| Company | Ticker | Price | MKT Cap. ($MM) | Cash ($MM) | Debt ($MM) | Tech Value ($MM) |
|---|---|---|---|---|---|---|
| NEXMED INC | NEXM | $1.06 | 57.8 | 6.8 | 6.9 | 57.9 |
| MAXYGEN INC | MAXY | $7.86 | 282.0 | 155.0 | 2.3 | 129.3 |
| CELL GENESYS INCORPORATED | CEGE | $6.33 | 288.3 | 178.5 | 196.8 | 306.6 |
| TITAN PHARMACEUTICALS | TTP | $2.84 | 92.4 | 6.8 | - | 85.6 |
| LARGE SCALE BIOLOGY CORP | LSBC | $0.45 | 2.9 | 0.1 | 1.0 | 3.8 |
| ALLOS THERAPEUTICS | ALTH | $3.42 | 188.2 | 52.8 | - | 135.4 |
| GENAERA CORP | GENR | $1.63 | 112.0 | 37.2 | - | 74.8 |
| DIVERSA | DVSA | $7.49 | 335.5 | 70.0 | 17.8 | 283.4 |
| ISTA PHARMACEUTICALS INC | ISTA | $6.19 | 160.1 | 44.1 | 4.2 | 120.3 |
| SEATTLE GENETICS INC /WA | SGEN | $5.21 | 220.8 | 41.4 | - | 179.4 |
| MEDIAN | | | $174.2 | | | $124.8 |
| MEAN | | | $174.0 | | | $137.6 |
| Halozyme | HTI | $2.80 | $140.1 | $10.5 | $1.7 | $131.3 |
| Peers Premium (based on median) | | | 24% | | | -5% |
| Peers Premium (based on mean) | | | 24% | | | 5% |

## Rodman & Renshaw — Halozyme Product Pipeline

| Product | Indication | Therapeutic Phase I | Phase II | Phase III | Filed NDA | Market | Phase IV | Probability of Approval | Launch | Year of Peak Sales | Peak Sales (Millions) | Risk Adj. Peak Sales | Life Cycle |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulase | Infertility | | | | | Market | | N/M | 2Q05 | 2015 | $6 | N/M | Medium |
| Hylenex | Spreading agent (cataract surgery) | | | | Filed NDA | | | 100% | 2Q06 | 2017 | $25 | $25 | Medium |
| Hylenex | Spreading agent (hypodermoclysis) | | | | Filed NDA | | | 100% | 2Q06 | 2017 | $250 | $250 | Medium |
| Chemophase | Oncology (bladder cancer) | | Phase II | | | | | 20% | 1Q09 | 2014 | $108 | $22 | Medium |
| Enhanze-INF | Biologic modified release | Pre-clinical | | | | | | 30% | 2010 | 2020 | $200 | $60 | Medium |
| HTI-101 | Oncology and inflammation | Pre-clinical | | | | | | | | | | | |
| HTI-101 | Inflammation lysosomal disorders | Research | | | | | | | | | | | |
| HTI-201 | Inflammation oncology | Research | | | | | | | | | | | |
| HTI-401 | Neurology, wound healing | Research | | | | | | | | | | | |

## Rodman & Renshaw

## Halozyme Revenue Model

*Dec FY, $ in millions*

| | 2004 | 1Q05 | 2Q05 | 3Q05 | 4Q05 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cumulase** | - | 0.0 | 0.0 | 0.03 | 0.05 | 0.125 | $0.30 | $0.75 | $1.46 | $2.23 | $3.16 | $4.17 | $5.32 | $5.64 | $6.01 | $6.15 |
| % change y/y | | | | | | 100% | 139.3% | 149.8% | 95.1% | 52.2% | 42.0% | 31.8% | 27.6% | 6.0% | 6.6% | 2.3% |
| % of total revenue | | *100%* | | *100%* | *100%* | 100% | 47% | 15% | 8% | 6% | 5% | 4% | 4% | 3% | 3% | 3% |
| **Hylenex** | | | | | | | 0.34 | 4.2 | 17.1 | 33.5 | 49.8 | 68.7 | 83.2 | 94.1 | 100.9 | 107.5 |
| % change y/y | | | | | | | | N/M | N/M | 96.1% | 48.6% | 38.0% | 21.1% | 13.2% | 7.2% | 6.5% |
| % of total revenue | | | | | | | 53% | 85% | 92% | 88% | 83% | 67% | 61% | 57% | 52% | 49% |
| **Enhanze-INF (risk adjusted)** | | | | | | | | | | | 3.0 | 7.3 | 14.4 | 21.2 | 30.8 | 40.0 |
| Enhanze-INF (unadjusted for risk) | | | | | | | | | | | 10.0 | 24.4 | 48.0 | 70.8 | 102.8 | 133.2 |
| % change y/y | | | | | | | | | | | | | | | | |
| % of total revenue | | | | | | | | | | | 5% | 7% | 11% | 13% | 16% | 18% |
| **Chemophase (risk adjusted)** | | | | | | | | | | 2.2 | 3.9 | 6.3 | 9.3 | 13.0 | 15.8 | 17.9 |
| Chemophase (unadjusted for risk) | | | | | | | | | | 10.8 | 19.4 | 31.3 | 46.4 | 64.8 | 78.8 | 89.6 |
| % change y/y | | | | | | | | | | | 80.0% | 61.1% | 48.3% | 39.5% | 21.7% | 13.7% |
| % of total revenue | | | | | | | | | | | 6% | 6% | 7% | 8% | 8% | 8% |
| **Future Products Sales** | | | | | | | | | | | | 15.5 | 24.1 | 32.4 | 40.9 | 50.1 |
| % change y/y | | | | | | | | | | | | | 55.4% | 34.7% | 26.1% | 22.5% |
| % of total revenue | | | | | | | | | | | | 15% | 18% | 20% | 21% | 23% |
| **Total product sales** | $0.0 | $0.0 | $0.0 | $0.03 | $0.1 | $0.1 | $0.3 | $0.7 | $1.5 | $4.4 | $10.1 | $33.3 | $53.1 | $72.3 | $93.5 | $114.1 |
| % change y/y | | | | | | | 413.6% | 149.8% | 95.4% | 199.7% | 129.0% | 230.8% | 59.7% | 36.1% | 29.4% | 22.0% |
| % of total revenue (tot. sales) | | | | | | | | | | | | 33% | 39% | 43% | 48% | 51% |
| **Other Revenue** | | | | | | | 0.3 | 4.2 | 17.1 | 33.5 | 49.8 | 68.7 | 83.2 | 94.1 | 100.9 | 107.5 |
| % change y/y | | | | | | | | | | | | 67% | 21.1% | 13.2% | 7.2% | 6.5% |
| % of total revenue | | | | | | | 53% | 85% | 92% | 88% | 83% | 67% | 61% | 57% | 52% | 49% |
| **Total revenues** | $0.0 | $0.0 | $0.0 | $0.03 | $0.1 | $0.1 | $0.6 | $5.0 | $18.6 | $37.9 | $59.8 | $101.9 | $136.3 | $166.4 | $194.4 | $221.6 |
| % change y/y | | | | | | | 670.5% | 670.5% | 274.0% | 104.3% | 57.9% | 70.4% | 33.7% | 22.1% | 16.9% | 14.0% |

## Rodman & Renshaw — Halozyme Income Statement (proforma)

*Dec FY, $ in millions*

| | 2004 | 1Q05 | 2Q05 (Act.) | 3Q05 (Act.) | 4Q05 (Est) | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | | | | | | | | | | | |
| Product sales | - | - | - | 0.0 | 0.1 | 0.1 | 0.3 | 0.7 | 1.5 | 4.4 | 10.1 | 33.3 | 53.1 | 72.3 | 93.5 | 114.1 |
| Other revenue | - | 0.0 | 0.0 | 0.0 | - | - | 0.3 | 4.2 | 17.1 | 33.5 | 49.8 | 68.7 | 83.2 | 94.1 | 100.9 | 107.5 |
| Total revenues | $0.0 | $0.0 | $0.0 | $0.0 | $0.1 | $0.1 | $0.6 | $5.0 | $18.6 | $37.9 | $59.8 | $101.9 | $136.3 | $166.4 | $194.4 | $221.6 |
| **Expenses:** | | | | | | | | | | | | | | | | |
| Cost of sales | - | - | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.3 | 0.9 | 1.9 | 6.1 | 9.6 | 13.1 | 16.9 | 20.6 |
| R&D | 6.5 | 2.5 | 2.2 | 3.2 | 3.0 | 10.8 | 10.6 | 11.1 | 12.2 | 14.9 | 18.1 | 25.4 | 30.5 | 35.2 | 40.0 | 44.9 |
| SG&A | 2.6 | 0.8 | 0.8 | 0.6 | 0.7 | 2.9 | 3.2 | 4.3 | 5.5 | 6.7 | 8.1 | 16.0 | 17.9 | 19.3 | 21.7 | 24.6 |
| Other expense | | | | | | | | | | | | | | | | |
| Total expenses | $9.1 | $3.3 | $3.0 | $3.8 | $3.7 | $13.7 | $13.9 | $15.6 | $18.0 | $22.4 | $28.1 | $47.6 | $58.1 | $67.5 | $78.6 | $90.1 |
| Operating income (EBIT) | ($9.1) | ($3.3) | ($2.9) | ($3.8) | ($3.6) | ($13.6) | ($13.3) | ($10.7) | $0.5 | $15.5 | $31.8 | $54.4 | $78.2 | $98.9 | $115.9 | $131.5 |
| Nonoperating income (interest) | (0.0) | 0.1 | 0.1 | 0.1 | 0.1 | 0.3 | 0.3 | 0.4 | 0.5 | 0.6 | 0.8 | 1.0 | 1.3 | 1.6 | 2.1 | 2.6 |
| Pre-tax income | ($9.1) | ($3.2) | ($2.9) | ($3.7) | ($3.6) | ($13.3) | ($12.9) | ($10.3) | $1.0 | $16.2 | $32.6 | $55.4 | $79.5 | $100.5 | $118.0 | $134.2 |
| Tax | - | - | - | - | - | - | 0.3 | 0.4 | 1.0 | 3.4 | 9.4 | 16.9 | 25.1 | 32.5 | 38.7 | 44.6 |
| Net income | ($9.1) | ($3.2) | ($2.9) | ($3.7) | ($3.6) | ($13.3) | ($12.9) | ($10.3) | $1.0 | $12.8 | $23.2 | $38.6 | $54.4 | $68.0 | $79.2 | $89.6 |
| Earnings per share (diluted): | ($0.26) | ($0.06) | ($0.06) | ($0.07) | ($0.06) | ($0.25) | ($0.21) | ($0.14) | $0.01 | $0.16 | $0.29 | $0.48 | $0.68 | $0.85 | $0.98 | $1.11 |
| Dividend per share | | | | | | | | | | | | | | | | |
| Weighted ave. shares (diluted): | 35.4 | 49.6 | 49.9 | 50.0 | 60.0 | 52.4 | 62.6 | 72.7 | 79.6 | 79.7 | 79.9 | 80.1 | 80.2 | 80.4 | 80.5 | 80.6 |
| Adjustment | | | | | | | | | | | | | | | | |

## Rodman & Renshaw

## Halozyme Cash Flow Model

*NOTE: Quarter cash flows are quarterly e*
*Dec FY, $ in millions*

| | 2004 | 1Q05 | 2Q05 | Act 3Q05 | Est 4Q05 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Cash Flows** | | | | | | | | | | | | | | | | |
| Net income (less) | (9.1) | (3.2) | (2.9) | (3.7) | (3.6) | (13.3) | (12.9) | (10.3) | 1.1 | 12.8 | 23.2 | 38.6 | 54.4 | 68.0 | 79.2 | 89.6 |
| Depreciation & Amortization | 0.1 | 0.1 | 0.1 | 0.0 | 0.1 | 0.2 | 0.4 | 0.7 | 0.9 | 1.1 | 1.4 | 1.6 | 1.9 | 2.2 | 2.6 | 3.1 |
| Other | 1.3 | 0.1 | (0.1) | 0.3 | 0.3 | 0.5 | 1.2 | 1.3 | 1.4 | 1.5 | 1.6 | 1.8 | 1.9 | 2.1 | 2.2 | 2.4 |
| Total CFO | ($7.7) | ($3.1) | ($3.0) | ($3.4) | ($3.2) | ($12.6) | ($11.3) | ($8.3) | $3.4 | $15.4 | $26.2 | $42.0 | $58.3 | $72.3 | $84.1 | $95.1 |
| **Investing Cash Flows** | | | | | | | | | | | | | | | | |
| Capital expenditures | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.5) | (0.9) | (1.1) | (1.3) | (1.6) | (1.8) | (2.1) | (2.5) | (2.9) | (3.4) | (3.9) |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total CFI | ($0.2) | ($0.1) | ($0.1) | ($0.1) | ($0.1) | ($0.5) | ($0.9) | ($1.1) | ($1.3) | ($1.6) | ($1.8) | ($2.1) | ($2.5) | ($2.9) | ($3.4) | ($3.9) |
| **Financing Cash Flows** | | | | | | | | | | | | | | | | |
| Cash dividends | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Change in capital stock | 23.4 | 0.3 | 0.0 | - | 17.5 | 17.7 | 20.3 | 20.3 | 0.4 | 0.4 | 0.5 | 0.5 | 0.6 | 0.6 | 0.7 | 0.7 |
| Other | - | - | - | 0.2 | 0.2 | 0.4 | 0.8 | 0.9 | 0.9 | 1.0 | 1.1 | 1.2 | 1.3 | 1.4 | 1.5 | 1.6 |
| Total CFF | $23.4 | $0.3 | $0.0 | $0.1 | $17.7 | $18.1 | $21.1 | $21.2 | $1.4 | $1.5 | $1.6 | $1.7 | $1.9 | $2.0 | $2.2 | $2.4 |
| **Change in Cash** | | | | | | | | | | | | | | | | |
| Exchange Rate Effect | | | | | | | | | | | | | | | | |
| Net change in cash/equivalents | $15.5 | ($2.9) | ($3.1) | ($3.4) | $14.3 | $5.0 | $8.9 | $11.8 | $3.4 | $15.3 | $26.0 | $41.6 | $57.7 | $71.5 | $82.9 | $93.5 |
| Cash: beginning of period | $0.5 | $16.0 | $13.1 | $10.1 | $6.6 | $16.0 | $21.0 | $29.9 | $41.6 | $45.0 | $60.4 | $86.4 | $128.0 | $185.6 | $257.1 | $340.0 |
| Cash: end of period | $16.0 | $13.1 | $10.1 | $6.6 | $21.0 | $21.0 | $29.9 | $41.6 | $45.0 | $60.4 | $86.4 | $128.0 | $185.6 | $257.1 | $340.0 | $433.6 |

## Rodman & Renshaw — Halozyme Balance Sheet

| Dec FY, $ in millions | 2004 | 1Q05 | 2Q05 | 3Q05 (Act.) | 4Q05 (Est.) | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | | | | | |
| Cash and short-term investments | 16.0 | 13.1 | 10.1 | 6.6 | 21.0 | 21.0 | 29.1 | 39.5 | 38.6 | 46.9 | 53.4 | 63.8 | 78.2 | 96.1 | 116.8 | 140.2 |
| Accounts receivable, net | - | - | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.4 | 0.5 |
| Inventories | 0.1 | 0.0 | 0.0 | 0.0 | 0.5 | 0.5 | 0.6 | 0.7 | 0.9 | 1.1 | 1.3 | 1.6 | 2.0 | 2.4 | 2.9 | 3.5 |
| Other current assets | 0.1 | 0.4 | 0.4 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | 0.5 | 0.6 | 0.7 | 0.8 | 0.9 | 1.1 |
| Total Current Assets | $16.1 | $13.5 | $10.5 | $6.9 | $21.7 | $21.7 | $30.1 | $40.6 | $40.0 | $48.5 | $55.3 | $66.1 | $81.0 | $99.5 | $121.0 | $145.2 |
| **Noncurrent Assets** | | | | | | | | | | | | | | | | |
| Property and equipment, net | 0.2 | 0.3 | 0.4 | 0.4 | 0.5 | 0.5 | 1.0 | 1.4 | 1.8 | 2.2 | 2.7 | 3.1 | 3.7 | 4.3 | 5.0 | 5.9 |
| Other noncurrent assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 19.5 | 50.7 | 93.9 | 147.6 | 209.7 | 279.9 |
| Total non-current assets | $0.3 | $0.3 | $0.4 | $0.4 | $0.5 | $0.5 | $1.0 | $1.4 | $1.8 | $2.3 | $22.2 | $53.9 | $97.6 | $151.9 | $214.8 | $285.8 |
| TOTAL ASSETS | $16.4 | $13.9 | $10.9 | $7.4 | $22.3 | $22.3 | $31.1 | $42.1 | $41.8 | $50.8 | $77.5 | $120.0 | $178.7 | $251.4 | $335.8 | $431.0 |
| **LIABILITIES** | | | | | | | | | | | | | | | | |
| Accounts payable | 1.5 | 1.8 | 1.4 | 1.4 | 1.5 | 1.5 | 1.8 | 2.1 | 2.4 | 2.8 | 3.3 | 3.8 | 4.5 | 5.3 | 6.2 | 7.2 |
| Short-term debt | - | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other liabilities | 0.1 | 0.2 | 0.3 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.5 | 0.5 | 0.6 | 0.6 | 0.7 | 0.7 | 0.8 | 0.8 |
| Total Current Liabilities | $1.6 | $1.9 | $1.7 | $1.8 | $1.9 | $1.9 | $2.2 | $2.5 | $2.9 | $3.3 | $3.8 | $4.4 | $5.2 | $6.0 | $6.9 | $8.0 |
| **Noncurrent Liabilities** | | | | | | | | | | | | | | | | |
| Long-term debt | - | - | 0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other non-current liabilities | - | $0.0 | (90.0) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Total non-current liabilities | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| TOTAL LIABILITIES | $1.6 | $1.9 | $1.7 | $1.8 | $1.9 | $1.9 | $2.2 | $2.5 | $2.9 | $3.3 | $3.8 | $4.4 | $5.2 | $6.0 | $6.9 | $8.0 |
| SHAREHOLDERS' EQUITY | $14.8 | $11.9 | $9.2 | $5.6 | $20.4 | $20.4 | $28.9 | $39.6 | $38.9 | $47.4 | $73.7 | $115.6 | $173.5 | $245.4 | $328.8 | $423.0 |

RODMAN & RENSHAW EQUITY RESEARCH

**RODMAN & RENSHAW RATING SYSTEM**:  Rodman & Renshaw employs a three-tier rating system for evaluating both the potential return and the risk associated with owning common equity shares of rated firms. The expected return of any given equity is measured RELATIVE to other companies in the same sector, as defined by First Call. The price objective is calculated to estimate the potential movement in price that a given equity could achieve if certain targets are met over a defined time horizon. Price objectives are subject to exogenous factors including industry events and market volatility. The risk assessment evaluates the company-specific risk and accounts for the following factors: maturity of market, maturity of technology, maturity of firm, cash utilization, and valuation considerations. Potential factors contributing to risk are a relatively undefined market, new technologies, an immature firm, high cash burn rates, and intrinsic value weighted toward future earnings or events.

## RETURN ASSESSMENT
- **Market Outperform**:  The common stock of the company is expected to outperform a passive index comprising all the common stock of companies within the same sector, as defined by First Call.
- **Market Perform**:  The common stock of the company is expected to mimic the performance of a passive index comprising all the common stock of companies within the same sector, as defined by First Call.
- **Market Underperform**:  The common stock of the company is expected to underperform a passive index comprising all the common stock of companies within the same sector, as defined by First Call.

## RISK ASSESSMENT
- **Speculative** – The common stock risk level is significantly greater than market risk. The stock price of these equities is exceptionally volatile.
- **Aggressive** - The common stock risk level is materially higher than market level risk. The stock price is typically more volatile than the general market.
- **Moderate** – The common stock is moderately risky, or equivalent to stock market risk.  The stock price volatility is typically in line with movements in the general market.

## RATING HISTORY



|    | Date    | Rating            | Target Price |
|----|---------|-------------------|--------------|
| 1. | 8/31/05 | Market Outperform | $2.88        |
| 2. | 2/27/06 | Market Perform    | N/A          |

## RATING SUMMARY

| Rating | Research Coverage (Past 12 months) | Investment Banking Services Provided |
|--------|------------------------------------|--------------------------------------|
| Outperform | 64% | 30% |
| Perform | 27% | 29% |
| Underperform | 2% | 50% |

Investment Banking Services include, but are not limited to, acting as a manager/co-manager in the underwriting or placement of securities, acting as financial advisor, and/or providing corporate finance or capital markets-related services to a company or one of its affiliates or subsidiaries within the past 12 months.

# ADDITIONAL DISCLOSURES

Rodman & Renshaw, LLC (the "Firm") is a member of NASD and SIPC and a registered United States Broker-Dealer.

ANALYST CERTIFICATION: I, Matthew Murray, hereby certify that the views expressed in this research report accurately reflect my personal views about the subject company(ies) and its (their) securities.

None of the research analysts nor any members of their households have a financial interest in the securities of Halozyme (including, without limitation, any option, right, warrant, future, or long or short position).

As of January 31, 2006, neither the Firm nor its affiliates beneficially own 1% or more of any class of common equity securities of Halozyme.

Neither the research analyst nor the Firm has any material conflict of interest with Halozyme of which the research analyst knows or has reason to know at the time of publication of this research report.

The research analyst principally responsible for preparation of the report does not receive compensation that is based upon (among other factors) any specific investment banking services transaction but may receive compensation based in part upon the Firm's overall investment banking revenues.

Neither the Firm nor its affiliates have received compensation from Halozyme for investment banking services within the past 12 months. The firm or its affiliates intend to seek compensation from Halozyme for investment banking services within three months, following publication of the research report.

Neither the research analyst nor any member of the research analyst's household nor the Firm serves as an officer, director, or advisory board member of Halozyme.

The Firm does not make a market in securities of Halozyme as of the date of this research report.

Any opinions expressed herein are statements of our judgment as of the date of publication and are subject to change without notice.

Reproduction without written permission is prohibited. The closing prices of securities mentioned in this report are as February 27, 2006. Additional information is available to clients upon written request. For a complete report on Halozyme, please call (212) 356 0500.

Readers are advised that this analysis report is issued solely for informational purposes and is not to be construed as an offer to sell or as the solicitation of an offer to buy. The information contained herein is based on sources we believe to be reliable but is not guaranteed by us as being accurate and does not purport to be a complete statement or summary of the available data. Past performance is no guarantee of future results.



**Rodman Renshaw**

Serving Emerging Growth Sectors For Over 50 Years

## DIRECTOR OF RESEARCH

| | |
|---|---|
| Michael G. King, Jr. | 212.356.0533 |

## BIOTECHNOLOGY

| | |
|---|---|
| Elemer Piros, Ph.D. | 212.356.0525 |
| Annie Li | 212.356.0544 |
| | |
| Reni J. Benjamin, Ph.D. | 212.356.0526 |
| Hao Zhou | 212.356.0504 |
| | |
| Navdeep S. Jaikaria, Ph.D. | 212.356.0538 |
| Sean Wu, Ph.D. | 212.356.0534 |
| Vernon Bernardino | 212.356.0531 |
| | |
| Matthew N. Murray, Ph.D., CFA | 212.356.0543 |
| | |
| Michael G. King, Jr. | 212.356.0533 |
| Andrew Hack, M.D., Ph.D. | 212.356.0541 |
| Sandy D. Balkin, Ph.D. | 212.356.0513 |

## SPECIALTY PHARMACEUTICALS

| | |
|---|---|
| Ilya Kravets | 212.356.0520 |

## MEDICAL DEVICES

| | |
|---|---|
| Suraj Kalia, CFA | 212.380.2610 |

## TECHNOLOGY

| | |
|---|---|
| Edward Ching | 212.356.0547 |

## DIRECTOR OF INSTITUTIONAL SALES

| | |
|---|---|
| William A. Iommi | 212.356.0549 |

## INSTITUTIONAL SALES

| | |
|---|---|
| Arthur W. Herbert Jr. | 212.356.0514 |
| Robert Kristal, CFA | 212.356.0516 |
| Alex Singal | 212.356.0548 |
| Terrance Kerr | 212.356.0510 |
| Dr. Ron Ree, DVM | 212.356.0611 |
| Ken Freelund | 212.380.2619 |
| Alger Boyer | 212.380.2627 |

## TRADING

| | |
|---|---|
| George Kowski | 212.356.0512 |
| Cynthia Van Osch | 212.356.0519 |
| James Park | 212.356.0522 |
| Daniel J. Hanley Jr. | 212.356.0512 |
| John Viteritti | 212.356.0512 |
| Ed Martinez | 212.380.2621 |
| Kamil Vojar | 212.380.2629 |

## CORPORATE FINANCE

| | |
|---|---|
| Michael Vasinkevich | 212.356.0505 |
| Edward Rubin | 212.356.0511 |

## CORPORATE

| | |
|---|---|
| John J. Borer, III | 212.356.0502 |
| Thomas Pinou | 212.356.0509 |
| William A. Iommi | 212.356.0549 |

## ADMINISTRATION

| | |
|---|---|
| Agnieszka Chrostowska | 212.356.0539 |
| Christine Viola | 212.356.0530 |
| Josephine Tesi | 212.356.0500 |

1270 Avenue of the Americas
New York, NY 10020
Ph: 212.356.0500
Fax: 212.581.5690
http://www.rodmanandrenshaw.com


Exhibit 5

From: Michael King
Sent: Monday, February 27, 2006 9:01 PM
To: Matthew Murray
Subject: RE: IRC - Downgrade of HTI

did you even read this before you sent it to me? the language is abysmal. it reads as though an illiterate wrote it. there is no way this can go out even if we hold an IPC in the morning.


Exhibit 6

From: Matthew Murray
Sent: Tuesday, February 28, 2006 10:23 AM
To: William A. Iommi
Subject: Halozyme

I would like you to immediately remove my name from coverage of Halozyme.  I do not favor recommending purchase of the stock at the current price (which is significantly above my price target) and have been prohibited by the Director of Research from downgrading the stock (see copy of email immediately below). I am receiving requests from salesman (which I have not responded to) to speak with their clients about this stock which puts me in a situation where my opinion on the stock is not the same as the rating that still exists on the stock in the First Call system.

Matt Murray


Exhibit 7

From: William A. Iommi
Sent: Tuesday, February 28, 2006 10:25 AM
To: Matthew Murray
Cc: Michael King
Subject: RE: Halozyme

You must get approval from the committee. Mike will be in around 11AM.

William A. Iommi



Exhibit 8

**From:** Matthew Murray
**Sent:** Tuesday, February 28, 2006 2:20 PM
**To:** William A. Iommi
**Subject:** RE: Halozyme

Halozyme is trading above $3/share when my target price is $2.88/share.  I am one of only two analysts covering this name and the stock has traded over 400,000 shares today with some investors incorrectly thinking that I am recommending purchase.  This problem is compounded by the fact that Rodman sales people have taken the management to meet investors today after I requested to have my rating on the stock lowered.  It is after 2PM and there is still no IPC.  If I am not allowed to control my rating then I must ask for a second time to have my name removed from a stock.  I do not believe in the market outperform rating at this price.

Matt Murray


Exhibit 9

**From:** William A. Iommi
**Sent:** Thursday, March 02, 2006 12:33 PM
**To:** Banking Group; Full Access Group; Research Group; Sales Group; Trading Group
**Subject:** INTERNAL USE ONLY - NOT TO BE DISSEMINATED OUTSIDE OF THE FIRM!

**Importance:** High

Matt Murray is leaving the Research Department.  In his new role at Rodman, he will be exploring the creation of an asset management business for Rodman & Renshaw Holding.

William A. Iommi
Chief Compliance Officer
1270 Avenue of the Americas
New York, NY 10020
Tel: 212-356-0549
Fax: 212-581-5690

Exhibit 10

# Did Wall Street Really Learn Its Lesson?

By GRETCHEN MORGENSON (NYT) 1335 words

Published: April 9, 2006

ALMOST four years have passed since securities regulators and Wall Street firms signed the $1.4 billion research settlement intended to remove bias from brokerage firm analysts' work. Has enough time gone by for business as usual to return to the Street?

That seems to be what some on Wall Street hope, judging from the story of Matthew N. Murray, a veteran analyst and portfolio manager who was recently fired from his post at Rodman & Renshaw, a small brokerage firm in New York City. Mr. Murray, 38, lost his job in March after downgrading the stock of Halozyme Therapeutics, a small biotechnology company he had followed since September 2005.


Mr. Murray said he downgraded the stock not because he had changed his view on its prospects. Rather, he said, its shares had hit his price target, so he took his rating from "outperform" to "market perform." Halozyme is an investment banking client of Rodman & Renshaw.

An aim of the $1.4 billion research settlement, you may recall, was to protect analysts from pressure by investment bankers or employees in other parts of their firms to write favorably about the companies they followed. But according to Mr. Murray, that kind of pressure is exactly what he experienced.

Mr. Murray's story begins in 2005, when he was hired by Rodman to help the firm expand its equity research, sales and trading operation. Its main business is raising capital for small companies that can't get in the door at bigger Wall Street firms. Rodman, which is privately held, focuses on health care and technology companies.

Before joining Rodman, Mr. Murray was a portfolio manager at Alliance Capital for five years. He has also worked as an analyst at Lehman Brothers, UBS and Alex. Brown. Mr. Murray's regulatory record -- called a C.R.D., for Central Registration Depository -- is clean.

Mr. Murray began recommending Halozyme last September, when the stock was at $1.86. He assigned a price target of $2.88 to it. In mid-December, Halozyme raised about $17.5 million from the public in a stock offering managed by S. G. Cowen & Company, Rodman & Renshaw and Roth Capital Partners. The price was $1.75 a share; buyers of the deal cannot sell their stock until mid-June.

All was quiet in January, but by mid-February, the stock was moving. It rose to $2; later that month it was $2.45. On Friday, Feb. 24, the stock hit $2.80, on no apparent news, Mr. Murray said. Because it was nearing his price target and the company's fundamentals had not changed, he prepared his downgrade report.

First, Mr. Murray said, he called the chief financial officer of Halozyme, to confirm that there were no new developments at the company. Then he asked the four members of Rodman's investment policy committee to meet to discuss his rating change.

The next day, a Saturday, he received an e-mail message from Michael G. King Jr., the research director at Rodman, suggesting that he maintain his rating on Halozyme by raising his price target. "If you'd like some help regarding how to finesse the price target on HTI your conversation should be had with me," Mr. King wrote, referring to the company, in the e-mail message. Mr. Murray provided a copy of the message to The New York Times.

In a return e-mail message, Mr. Murray said he was not interested in finessing the price target. He did, however, agree to meet on Monday, Feb. 27, with the chief financial officer from Halozyme to assess its fundamentals once more. Rodman was about to be host for a series of meetings for Halozyme with the firm's clients. While many meetings like this are related to a securities offering, this one was not.

Halozyme shares hit $3 that day. Having confirmed his previous investment thesis in his meeting with the C.F.O., Mr. Murray submitted his downgrade report. Mr. King, citing what he called the "abysmal" quality of the writing in the report, advised the analyst that the report could not go out. Mr. Murray asked to convene a meeting with the investment policy committee, to no avail. No report has been published.

On Feb. 28, Mr. Murray sent the first of two e-mail messages to William A. Iommi, Rodman's head of compliance, asking that the firm remove his name from coverage of Halozyme. All analysts must certify that their reports truly reflect their opinions, and because Mr. Murray's previously issued buy recommendation no longer reflected his view, he said he should not be held accountable for it. On Thursday, March 2, Mr. Iommi told the firm's employees that Mr. Murray was leaving its research department. "In his new role at Rodman, he will be exploring the creation of an asset management business for Rodman & Renshaw Holding," Mr. Iommi wrote in an e-mail message. Twelve days later, Mr. Murray was fired.

"I am proud of the success that I helped create in my one year at Rodman," Mr. Murray said. "When I joined the firm in March 2005 it was ranked 17th in biotech research according to First Call. Over the next nine months I recruited new directors of sales, research and health care investment banking. By the end of the year, the firm ranked No. 3, and I was the top-ranked analyst" at the firm.

THERE are two sides to every story, of course. But many of the players in this drama are not talking about it. Mr. Iommi, for instance, declined to comment about the circumstances surrounding Mr. Murray's firing.

Gen. Wesley K. Clark is chairman of Rodman & Renshaw. In late March, Mr. Murray related his story to General Clark in an e-mail message; he got no response. General Clark did not return a phone call seeking comment.

David A. Ramsey, chief financial officer of Halozyme, did not return a phone call seeking comment.

One person who was willing to speak about the matter is Jay S. Auslander, a partner at the law firm Siller Wilk L.L.P. in New York who represents Rodman. "Mr. Murray was not terminated because he wanted to downgrade Halozyme or any other stock," he said. "Rodman has always acted with the highest level of integrity and fully complies with all the rules and regulations relating to target pricing and to analyst recommendation changes. Mr. Murray's termination related to issues concerning his professionalism including the manner in which he interacted with others."

But Mr. Auslander declined to provide details about Mr. Murray's interactions with others, citing Rodman's policy of not discussing personnel matters. He said the firm could not comment on the e-mail messages written to Mr. Murray by Mr. King and Mr. Iommi.

An executive at a company followed by Mr. Murray described him as an analytic professional whose work was comprehensive and intelligent. The executive, who agreed to speak only on the condition of anonymity because he still deals with Rodman, said he had known and respected Mr. Murray for 12 years "through downgrades and upgrades."

Analyst downgrades are bound to disappoint some companies and the investment firms hoping to stay on good terms with them. But a downgrade may have been especially unwelcome in the Halozyme case, given that the investors who bought the stock last December at $1.75 cannot sell until the lockup expires in June.

Happily, though, the dustup at Rodman has not hurt Halozyme's shares. They closed Friday at $3.25.

Mr. Murray, meanwhile, has applied to join the National Guard and is awaiting word on his application. He said he has told his story to staff members in the office of Senator Charles E. Grassley, the Iowa Republican who is chairman of the Senate Finance Committee, and to officials at the Securities and Exchange Commission. Mr. Grassley's office confirmed the discussions; the S.E.C. declined to comment, as is its custom.

Wall Street, like politics, ain't beanbag, of course. But wouldn't it be nice if investors could be confident that the analysts whose research they read were opining freely -- and without the fear of being fired?


Photo: Matthew N. Murray was fired by Rodman & Renshaw shortly after he refused to change a downgrade report on Halozyme Therapeutics. (Photo by Lars Klove for The New York Times)(pg. 12)

# Exhibit 11

## PART I

1. Notice Received From: (Name of firm initiating the internal review):
   RODMAN & RENSHAW, LLC

2. Date internal review initiated (MM/DD/YYYY):

   02/28/2006 ⦿ **Exact** ○ **Explanation**

   If not exact, provide explanation:

3. Describe briefly the nature of the internal review or details of the conclusion. (The information must fit within the space provided.):
   THE FIRM HAS COMMENSED AN INTERNAL REVIEW OF THE INDIVIDUAL TO DETERMINE WHETHER HE VIOLATED RULES AND REGULATIONS RELATING TO ANALYST CONDUCT, INCLUDING PROVISIONS OF NASD RULE 2711 RESTRICTING COMMUNICATIONS WITH A COMPANY THAT IS THE SUBJECT OF AN ANALYST'S REPORT.

4. Date internal review concluded (MM/DD/YYYY):

   ○ **Exact** ⦿ **Explanation**

   If not exact, provide explanation:
   ON-GOING

## PART II

INDIVIDUAL SUBJECT MAY USE THIS SPACE FOR DETAILS TO AFFIRMATIVE ANSWERS OF ITEM 7(B) ONLY

The individual who is the subject of the internal review may provide a brief summary of this event. The summary must fit within the space provided below. This summary may be submitted electronically to the CRD by the terminating *firm* or may be sent to: CRD, P.O. Box 9495, Gaithersburg, MD 20898-9495.

---

Rev. Form U5 (10/2005)

### CRIMINAL DRP

No Information Filed

Rev. Form U5 (10/2005)

### TERMINATION DRP

No Information Filed

Rev. Form U5 (10/2005)

### REGULATORY ACTION DRP

No Information Filed

Rev. Form U5 (10/2005)

### CUSTOMER COMPLAINT/ARBITRATION/CIVIL LITIGATION DRP

No Information Filed

Exhibit 12

May 25, 2006

**Via Electronic Transmission**

The Honorable Christopher Cox
Chairman
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Dear Chairman Cox:

We write today regarding allegations that were recently presented to our staff and reported in *The New York Times* regarding certain activities at Rodman & Renshaw L.L.C. (Rodman & Renshaw).

The *Times* article, together with information provided to our offices by the terminated analyst, raises serious questions about whether Rodman & Renshaw may have violated 17 C.F.R. § 242.501 (regarding assurance that research reports accurately reflect the views of the named analyst) and NASD Rule 2711 (prohibiting retaliation against research analysts). These allegations raise serious questions regarding the independence of the research analysts at Rodman & Renshaw. As the regulatory agency charged with ensuring the protection of investors and the integrity of markets, the Securities and Exchange Commission (SEC) should ensure that all brokerage firms, regardless of size, are operating within the confines of the law.

Accordingly, we request that your office provide a briefing to our Committee staff as soon as possible regarding the allegations set forth in the attached article. Further, we formally request that the SEC conduct a comprehensive and thorough examination into this matter and provide us with regular updates.

We thank you in advance for having your staff coordinate with ours to schedule an initial briefing no later than June 2, 2006. Any questions or concerns should be directed to Emilia DiSanto or Nick Podsiadly for Chairman Grassley at (202) 224-4515 or John Angell for Senator Baucus at (202) 224-7800

Sincerely,

Charles E. Grassley
Chairman

Max Baucus
Ranking Member

Attachment


Cc:    Gen. Wesley Clark (ret)
       Chairman of the Board
       Rodman & Renshaw, L.L.C.
       1270 Avenue of the Americas
       16th Floor
       New York, NY 10020

Exhibit 13

May 25, 2006

**Via Facsimile: (212) 581-5690**
**Via Electronic Transmission**

General Wesley K. Clark (ret.)
Chairman of the Board
Rodman & Renshaw, L.L.C.
1270 Avenue of the Americas
16th Floor
New York, NY 10020

Dear General Clark:

As a member of the United States Senate, and as Chairman of the Committee on Finance, it is my duty under the constitution to conduct oversight into the actions of government agencies and entities that are regulated by them. I write today regarding allegations that were recently presented to our staff and reported on in *The New York Times* regarding certain activities at Rodman & Renshaw L.L.C. (Rodman & Renshaw).

More specifically, the article in *The New York Times* discussed events surrounding the termination of a research analyst's employment with Rodman & Renshaw after his decision to downgrade the stock of one of the firm's investment banking clients. The article further outlines that a series of emails exist where senior managers at Rodman & Renshaw sought to intervene in the decision to downgrade this stock, offering to help the analyst "finesse the price target." Taken on their face, these allegations paint a picture of a firm that was attempting to control the outcome a research analyst report to benefit an investment banking client's stock price.

As you are aware, on April 28, 2003, the Securities and Exchange Commission (SEC), along with the National Association of Securities Dealers (NASD), the New York Stock Exchange (NYSE) and the New York State Attorney General's Office entered into a $1.4 billion global settlement agreement (global settlement) with 10 major Wall Street brokerage firms. The global settlement was a result of an investigation of practices at the major firms and potential bias in reports issued by research analysts on a stock of a company that is also an investment banking client of the same firm. Resulting from specific instances of manipulation of research reports, the global settlement required the major firms to undertake significant structural reforms, enhance disclosure requirements, create standards for protecting independent research, and provide money for investor education. More importantly, the global settlement served as a symbolic measure to show that independent research by Wall Street firms should in fact be wholly independent of the investment banking and other financial interests of the firms providing the research.

While not a party to the global settlement agreement, nevertheless, Rodman & Renshaw ought to adhere to the principles established in the global settlement. The allegations reported in *The New York Times* regarding Rodman & Renshaw create the appearance that the firm's research may not be sufficiently independent and reliable. I understand that the research analyst contacted you directly, via email on March 23, 2006, to report that the firm was continuing to recommend the stock contrary to his recommendation and seeking your assistance in taking corrective action. His email, and the timeline it contains, raises serious questions about whether your firm may have violated 17 C.F.R. § 242.501 (regarding assurance that research reports accurately reflect the views of the named analyst) and NASD Rule 2711 (prohibiting retaliation against research analysts.

Accordingly, I request that you make yourself available for an interview with Committee staff. Please be prepared to address the following questions:

1. Having received information regarding potential misconduct at Rodman & Renshaw, what steps have you taken as Chairman of the Board to investigate these allegations?
2. Specifically, have you contacted the analyst or other witnesses involved to gather more information? If not, why not?
3. Have you consulted or hired outside counsel to investigate the circumstances and provide objective advice to the Board about how to respond to the allegations? If not why not?

I thank you in advance for having your staff coordinate with ours no later than close of business on May 31, 2006 to provide a point of contact for this inquiry. Any questions or concerns should be directed to Emilia DiSanto or Nick Podsiadly of my staff at (202) 224-4515.

Sincerely,

Charles E. Grassley
Chairman

Attachments

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK  )
                       ) ss.:
COUNTY OF NEW YORK  )

      **JONATHAN GOLDEN**, being duly sworn, deposes and states:

      I am over 18 years of age, I am not a party to the within action, and I reside in Brooklyn, New York.

      On October 17, 2006, I caused to be served true and complete copies of the **ANSWER AND COUNTERCLAIMS** upon:

**Jay S. Auslander, Esq.**
**SILLER WILK LLP**
*Attorneys for Plaintiffs*
**675 Third Avenue**
**New York, New York 10017**
**(212) 421-2233**

By causing the **ANSWER AND COUNTERCLAIMS** to be delivered by hand to the above-named person at the above listed address using Champion Courier Service.

_____
Jonathan Golden

Sworn to before me this
17th day of October, 2006

_____
Notary Public

REBECCA CARAVAGLIO
Notary Public, State of New York
No. 43-4993626
Qualified in Richmond County
Commission Expires March 23, 20 10

*00030858.doc*